[Cite as *In re C. Children*, 2020-Ohio-946.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: C CHILDREN. | : | APPEAL NOS. C-190650 |
| | | C-190682 |
| | : | TRIAL NO. F17-1542X |
| | : | *O P I N I O N.* |

Appeals From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: March 13, 2020

*Phyllis Schiff*, for Appellant Mother,

*Roger W. Kirk*, for Appellant *In re Williams* Attorney for minor children,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*ProKids* and *Jeffrey A. McCormick*, for Appellee Guardian ad Litem for minor children.

**BERGERON, Judge.**

{¶1}   A child endangerment conviction provides the backdrop for this case concerning the termination of Mother's parental rights.  On appeal, Mother presents two assignments of error, principally attacking the foundation of the juvenile court's decision. We have carefully reviewed the record, however, and conclude that the juvenile court did not err in terminating Mother's parental rights.  We accordingly affirm the decision below.

I.

{¶2}   This appeal involves Mother and three of her seven children, J.C.1, T.C., and J.C.2.  The Hamilton County Department of Job and Family Services ("HCJFS") first encountered the family after relatives reported Mother's abuse of one of her children (who is not part of this appeal).  In June 2017, Mother circulated videos to family members depicting her holding her four-month-old child's head down in an attempt to suffocate her and swinging the child back and forth from the neck by a rope.  Accompanying these disturbing videos, Mother launched a profanity-laced tirade (via text) containing threats to her daughter's life: "I did not want her so I hope she dies, I will not feed her or nothing, he need to come get her she done make it through the night (sic)."  Not surprisingly, in the aftermath of this event, HCJFS received an ex parte order for emergency custody of all seven children.  And, within a few months, the court adjudicated the children dependent, awarding HCJFS temporary custody in October 2017.

{¶3}   Meanwhile, the police arrested and charged Mother with child endangerment based on her conduct in the videos.  Ultimately, Mother pled guilty in October 2017 and received a two-year sentence.  In April 2018, during Mother's incarceration, HCJFS moved to modify temporary custody of all seven of her children to permanent custody.  However, soon after this filing, HCJFS succeeded in placing four of the children with a paternal aunt,

leaving J.C.1, T.C., and J.C.2 as the only children subject to the permanent custody modification. Notwithstanding Mother's failure to communicate with her children in any manner while incarcerated, she nevertheless requested that the court extend temporary custody and protested permanent custody. Without a ruling on this motion, the custody proceedings continued along, and, in November 2018, Mother received an early release from prison for good behavior.

{¶4} About a month after her release, Mother met with her caseworker and dove head first into case plan services. Mother completed two diagnostic assessments through Family Access to Integrated Recovery—neither of which recommended any further mental health services—actively engaged in parenting education classes, and participated in random drug screens. Further, in the beginning of February 2019, Mother began visits with J.C.1, T.C., and J.C.2 at the Family Nurturing Center for about two hours once a week. Although the visits improved over time, at one point HCJFS recommended separate visits due to all three children's extensive needs and J.C.1's tendency to "tak[e] up all of the attention" during Mother's visits. The oldest, J.C.1, exhibits severe emotional and behavioral issues, which often turn violent, resulting in his displacement from roughly five foster homes and two schools. As a result of these issues, he receives medication, attends therapy and a special school for children with behavioral issues, and is managed by a case manager. Similarly, both T.C. and J.C.2 have their own special needs, with T.C. engaging in therapy for his emotional concerns and, on at least one occasion, being displaced from his foster home for behavioral issues, and J.C.2 attending a therapeutic interactive preschool to assist with his behavioral problems. Given the magnitude of these issues, HCJFS placed the children in separate foster homes in 2017.

{¶5}  In May 2019, the juvenile court convened a permanent custody trial with various interests represented.  On the one hand, the magistrate heard from HCJFS's caseworker and the guardian ad litem ("GAL") for the children, both recommending HCJFS receive permanent custody of all three children based on the children's significant mental, emotional, and behavioral needs, the difficulties of placing all three children together, Mother's recent child endangerment history, and her failure to contact the children while incarcerated.  On the other hand, Mother asserted that the best interests of the children would be served by placing them with her, emphasizing the various services she completed both in prison and in her case plan, how these services improved her parenting skills, her current full-time job, and her consistency in visiting her children (postrelease from prison). In Mother's corner, the *In re Williams* attorney also requested that the magistrate deny HCJFS permanent custody, reminding the magistrate that both J.C.1 and T.C. expressed their desire to return to Mother's care.  Finally, J.C.1's father demanded the magistrate deny HCJFS permanent custody as to J.C.1 (but he did not appeal the permanent custody determination, and thus we need not dwell on his arguments).  No father of the other two children appeared to challenge the permanent custody motion below.

{¶6}  Ultimately, after considering all the evidence, the magistrate accepted HCJFS's and the GAL's recommendation, granting HCJFS permanent custody of all three children.  Although both Mother and the *In re Williams* attorney lodged objections to the magistrate's decision, the juvenile court, in a thorough decision, upheld the magistrate's decision granting permanent custody to HCJFS.  In the wake of this ruling, Mother and the *In re Williams* attorney appeal this order terminating Mother's parental rights, both asserting that the juvenile court erred as a matter of law in granting HCJFS's motion for

permanent custody.  In addition, Mother raises a second assignment of error, challenging two particular aspects of the proceedings below.

II.

{¶7}    Because Mother and the *In re Williams* attorney both assign the same error to the juvenile court's award of permanent custody to HCJFS, we address their assignments of error together.   Specifically, Mother and the *In re Williams* attorney assert that, in light of Mother's engagement with her case plan, consistent postrelease visits with her children, and participation in various services, the juvenile court's award runs counter to the manifest weight of the evidence and that the court lacked clear and convincing evidence that the children cannot be returned to Mother within a reasonable time.

{¶8}    When reviewing a juvenile court's grant of permanent custody, we must independently find that clear and convincing evidence supports the decision.  *See In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46 ("As an appellate court, we do not review the juvenile court's decision under an abuse-of-discretion standard; rather, we must examine the record and determine if the juvenile court had sufficient evidence before it to satisfy the statutory clear-and-convincing standard.").  The clear and convincing standard requires evidence sufficient to " 'produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' "  *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.  As to Mother's and the *In re Williams* attorney's challenges to the manifest weight, we must evaluate whether the juvenile court lost its way in resolving conflicts in the evidence, which in turn caused a manifest miscarriage of justice.  *See In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 16.  On the other hand, in reviewing their sufficiency challenges,

we scrutinize the record to determine whether the juvenile court had sufficient evidence to satisfy the clear and convincing standard. *Id.* at ¶ 15.

{¶9} As always, we begin our review from the framework set forth in R.C. 2151.414. Under R.C. 2151.414, the court will only grant permanent custody if it finds by clear and convincing evidence that (1) one of the conditions enumerated in R.C. 2151.414(B)(1)(a) through (e) exists, and (2) granting permanent custody to the agency is in the best interests of the children. *See In re Z.H.*, 1st Dist. Hamilton Nos. C-150305 and C-150301, 2015-Ohio-3209, ¶ 8. Because neither party takes issue specifically with the court's best interest findings, we focus our attention on the first prong.[1] *See In re S.C.*, 9th Dist. Summit No. 27676, 2015-Ohio-2623, ¶ 28 (declining to review the court's best interest analysis because Mother "confines her argument to the trial court's findings that the children could not or should not be returned to her custody" and "does not specifically challenge the trial court's best interest findings under the mandatory factors[.]" ).

{¶10} The magistrate and juvenile court here elected to utilize R.C. 2151.414(B)(1)(a), finding that the children cannot be placed with either parent within a reasonable time and should not be placed with the children's parents. In reaching this result, the court must consider the criteria outlined in R.C. 2151.414(E) and find that at least one of the delineated factors exists. *See In re T/R/E/M*, 1st Dist. Hamilton No. C-180703, 2019-Ohio-1427, ¶ 17. And if the court discovers one or more of the conditions exists, then the court must enter a finding under R.C. 2151.414(B)(1)(a). *See In re P.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 13, citing R.C. 2151.414(B)(1)(a) ("If the court finds that one or more of the 16 conditions in R.C. 2151.414(E) exists, then the court

---

[1] We note that neither Mother nor the *In re Williams* attorney in their briefs even referenced the best interest factors outlined in R.C. 2151.414(D). If a parent desires to challenge this issue, he or she must clearly do so in his or her appellate brief and provide us specific arguments as to how the juvenile court went astray.

must enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.").

{¶11} This brings us to the R.C. 2151.414(E) conditions both the magistrate and juvenile court focused upon. First, based upon Mother's child endangerment conviction, the court properly found R.C. 2151.414(E)(7) satisfied: "The parent has been convicted of or pleaded guilty to * * * [a]n offense under division (B)(2) of section 2919.22 of the Revised Code * * * and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense[.]" R.C. 2151.414(E)(7)(c). As described above, Mother sent videos to family members, accompanied by texts threatening the child's life, depicting her physically abusing the children's four-month-old sister. Those relatives in turn reported the videos to the police and HCJFS, resulting in Mother pleading guilty to, and ultimately being convicted of, child endangerment under R.C. 2919.22(B)(2). That record supports the court's finding that Mother's conviction satisfied R.C. 2151.414(E)(7).

{¶12} Additionally, the magistrate and juvenile court found other relevant circumstances existed in this case to warrant utilizing the catch-all provision, R.C. 2151.414(E)(16). Chief among them, the court noted the children's severe emotional and behavioral issues. As detailed above, J.C.1's emotional and behavioral issues occur frequently, and often turn violent, resulting in his displacement from several foster homes and two schools. On occasions, J.C.1 has attempted to choke a teacher with a scarf, leaped out of his foster parent's car and run off (resulting in police involvement and hospitalization), and acted out at school to the point that physical restraints became necessary. Due to these issues, J.C.1 attends a special school addressing behavioral issues, receives medication and therapy, and maintains contact with a case manager. Beyond

7

J.C.1's issues, T.C. and J.C.2 for their part also require extensive care for their special needs. T.C. engages in therapy to help with his emotional issues and, like his older brother, was displaced from a foster home due to his behavioral issues. And his aggressive behaviors, as the HCJFS's caseworker noted at trial, seem to only increase when surrounded by his siblings. J.C.2 also requires therapeutic interactive preschool to help improve his behaviors. As a result of the three children's severe behavioral issues, HCJFS's caseworker explained that the agency separated the children into different foster homes in 2017, warning against reuniting the siblings—"the significant amount of attention that they all three require, it's almost impossible to put them in a home together."

{¶13} While Mother acknowledges these challenges, she points the finger at the foster care system as the reason for their behaviors, effectively suggesting that the court look the other way given her belief as to the root cause of the problem. While perhaps both sides could debate the genesis of the children's behavioral issues, the matter we must confront is whether Mother is capable of caring for the children in light of these serious problems. And this occurs against a backdrop of Mother lashing out violently before towards her children. When questioned at trial about her child endangerment conviction, Mother explained that she felt "stressed out" at that moment, insisting that it would not happen again because, this time around, she would be caring for only three children instead of seven and because she would seek help when she felt stressed. But this turns a blind eye to the realities of caring for three children requiring extensive attention and care and with a tendency to exacerbate their behavioral issues when collected together.

{¶14} Our faith in Mother's understanding as to the difficulties in store for her if reunified with her children is further undermined in light of her testimony at trial that her child endangerment "charge wasn't that violent." We must disagree with that

8

characterization; the conduct was disturbing and could well have resulted in the death of her daughter. Accordingly, based upon all three children's significant needs and the likely negative effects caused by living together, in hand with Mother's child endangerment history and the reasons for its occurrence, we find clear and convincing evidence supported the juvenile court's finding that R.C. 2151.414(E)(16) applied. *See In re B.S.*, 4th Dist. Pike No. 18CA890, 2018-Ohio-4645, ¶ 70 (holding the children's serious behavioral and mental health issues in hand with Mother's past history and ability to handle herself "in the face of three challenging young children" required a "finding that the children should not be placed with the mother" under R.C. 2151.414(E)(16)).

{¶15} We must point out, however, that in this appeal, Mother emphasizes the progress that she made after her release from prison and in connection with her case plans. To be sure, she is to be commended for such efforts and juvenile courts should strongly consider when a parent rehabilitates himself or herself and turns a corner. But we cannot view one aspect of the case in isolation without taking into account the full context, particularly on the record before us. And Mother's failure to squarely account for that broader context leaves us with little to question in the juvenile court's order, particularly given that Mother failed to marshal any challenge on appeal to the best interest factors.

{¶16} Therefore, based upon the above analysis, clear and convincing evidence supports the court's findings that the children could not be placed with Mother within a reasonable time and should not be placed under R.C. 2151.414(B)(1)(a), and the court's decision was not against the manifest weight of the evidence. We accordingly overrule Mother's first and the *In re Williams* attorney's assignments of error.

III.

{¶17} Turning to Mother's second assignment of error, she challenges two aspects of the proceedings below, specifically (1) the magistrate's failure to rule on both Eric Williams's (the father of Mother's other children who is not involved in this appeal) and Mother's motion to extend temporary custody, and (2) the failure to rule on Mother's motion for an *In re Brown* evaluation. We dispose of Mother's first challenge regarding Mr. Williams's motion to extend temporary custody in short order, since not only did Mr. Williams not father any of the children involved in this appeal, but Mother lacks standing to assign error on his behalf when he never appealed. *See In re J.C.*, 10th Dist. Franklin Nos. 09AP-1112, 09AP-1113 and 09AP-1114, 2010-Ohio-2422, ¶ 15 (reasoning the court need not address a trial court's failure "to rule on [paternal grandmother's] motion seeking to have custody of the children" because appellant's challenge "actually constitutes an assertion of error on [paternal grandmother's] behalf, and she lacks standing to assert rights belonging to [paternal grandmother]."); *In re T.W.*, 1st Dist. Hamilton No. C-130080, 2013-Ohio-1754, ¶ 9 ("[A]n appellant cannot raise issues on behalf of an aggrieved third-party[.]").

{¶18} As to Mother's other challenges, generally when a court fails to rule on a motion, we presume the court denied it. *See In re K.M.S.*, 3d Dist. Marion Nos. 9-15-37, 9-15-38 and 9-15-39, 2017-Ohio-142, ¶ 76 ("At the outset we note that by failing to rule on said motion, the trial court, in effect, denied the motion."). Accordingly, we presume here that the magistrate denied Mother's motion to extend temporary custody since he never ruled on it. With respect to her motion for an *In re Brown* evaluation, HCJFS asserts the magistrate indeed denied this motion at the May 2019 hearing. Regardless, Mother faces a threshold problem with these challenges because she failed to object to the magistrate's denial of both motions (or the failure to rule, as the case may be) in her objections before the juvenile

10

court, which confines our review to plain error. *See In re T.K.M.*, 1st Dist. Hamilton No. C-190020, 2019-Ohio-5076, ¶ 26 ("Further, father never objected to the court's initial decision to place the child with J.C. Therefore, he forfeited all but plain error."); Juv.R. 40(D)(3)(b)(iv). Generally, plain error only applies in situations in which the error " 'seriously affects the basic fairness, integrity, or public reputation of the judicial process[.]' " *In re J.W.*, 1st Dist. Hamilton No. C-190189, 2019-Ohio-2730, ¶ 7, quoting *In re Etter*, 134 Ohio App.3d 484, 492, 731 N.E.2d 694 (1st Dist.1998).

{¶19} Reviewing for plain error, Mother cannot satisfy this high burden. Regarding her motion to extend temporary custody, Mother maintains that if granted an extension, the additional time would have enabled her to complete more case plan services, possibly paving the way for a more favorable outcome. But, as we discussed above, the court's decision to grant HCJFS permanent custody hinged not upon her completion of services. In fact, the court acknowledged Mother's success in completing much of her case plan, but nevertheless relied upon the extensive behavioral and emotional needs of the children in conjunction with Mother's child endangerment conviction in granting permanent custody to HCJFS. Accordingly, we see no plain error in the denial of Mother's motion to extend temporary custody.

{¶20} Nor do we see plain error in the magistrate's denial of Mother's motion for an *In re Brown* evaluation. This court in *In re Brown*, 1st Dist. Hamilton No. C-850878, 1986 WL 13385 (Nov. 26, 1986), reversed the grant of permanent custody because due process required the appointment of a psychiatric expert in the permanent custody proceeding where the parent's mental or emotional health was the determinative issue. *Id.* at *2, 6. "But where a parent's mental health is not at issue, psychiatric expertise would contribute

11

little to the proceedings and is not required." *In re C.W.*, 1st Dist. Hamilton No. C-110342, 2011-Ohio-4756, ¶ 32.

{¶21} In this case, the court did not rely upon R.C. 2151.414(E)(2)—that Mother suffered chronic mental illness or chronic emotional illness—nor was her mental health a determinative issue in the court's permanent custody decision. As a result, a psychiatrist's testimony was unnecessary to counter any allegations that her mental health affected her parenting ability. *See In re B.G.*, 8th Dist. Cuyahoga No. 81982, 2003-Ohio-3256, ¶ 23 ("Because the parent's mental health in this case was not the predominant issue from the outset and did not ultimately become the determinative issue in the court's permanent custody analysis, the rationale in *Brown* and *Schaeffer* for the need of a psychiatrist does not apply here."); *In re C.W.* at ¶ 33 ("Because [Mother's] mental health was not the predominant issue or determinative issue in the court's permanent-custody decision, a psychiatrist's testimony was not necessary to counter any allegation that her mental condition had affected her parenting ability."). On these facts, we cannot find plain error in the denial of her motion for an *In re Brown* evaluation.

{¶22} For the forgoing reasons, we accordingly overrule Mother's second assignment of error.

IV.

{¶23} Although we indeed appreciate the seriousness of terminating Mother's parental rights, where sufficient clear and convincing evidence supports the determination of the juvenile court, and the decision is not against the manifest weight of the evidence, we cannot hold that the juvenile court erred. Further, the magistrate did not err in denying Mother's motion to extend temporary custody or for an *In re Brown* evaluation. We

accordingly overrule Mother's two assignments of error and the *In re Williams* attorney's sole assignment of error, and affirm the juvenile court's judgment.

Judgment affirmed.

**MOCK, P.J.,** and **WINKLER, J.,** concur.

Please note:

The court has recorded its own entry this date.