[Cite as *In re De.R.*, 2024-Ohio-1183.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: DE.R., DI.R., AND DA.R. | : | APPEAL NO. C-230685<br>TRIAL NO. F08-566X |
| | : | |
| | : | *O P I N I O N.* |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: March 29, 2024

*Alana Van Gundy*, for Appellant Mother,

*Michael Lanzilotta*, Guardian Ad Litem for Appellant Mother,

*Kacy Eaves*, for Appellee De.R.,

*Raymond T. Faller*, Hamilton County Public Defender, and *Mary M. Salyer*, Assistant Public Defender, Appellee Guardian Ad Litem for the minor children,

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Jack Besignano*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services.

**BERGERON, Judge.**

{¶1}   In this parental termination case, no one disputes that appellant Mother loves her children and made some steps towards reunification. Unfortunately, a variety of mental health challenges, stints of incarceration, and a refusal to more meaningfully engage in reunification processes proved impediments that prompted appellee Hamilton County Department of Job and Family Services ("HCJFS") to seek permanent custody, which the juvenile court granted. On appeal, Mother raises three challenges to the underlying result: (1) she contests the grant of permanent custody, (2) she raises evidentiary issues regarding certain testimony presented, and (3) she questions the initial removal of her youngest child and the termination of her therapeutic services. Based on a thorough review of the record, the applicable law, and the arguments raised, we are not persuaded by any of these arguments. We accordingly affirm the juvenile court's grant of permanent custody of the children to HCJFS.

I.

{¶2}   This case involves Mother and her three children, De.R, Di.R., and Da.R. Ongoing domestic violence concerns spurred the initial encounter between HCJFS and the family. Following violent incidents between Mother and her paramour resulting in her traumatic brain injury, HCJFS received an ex parte emergency order of interim custody for De.R. and Di.R., and it quickly filed a motion for interim custody, which the juvenile court granted.

{¶3}   In October 2020, De.R. and Di.R. were adjudicated dependent. The case plan required Mother to engage in services, including a mental health assessment, drug testing, parenting classes, and a diagnostic assessment of functioning ("DAF").

2

She was also required to demonstrate stable housing and income. According to testimony at trial, during the pendency of the case, although Mother completed the DAF, she encountered obstacles in complying with her case plan. She was incarcerated twice, did not maintain employment from at least October 2019 through January 2022 (later obtaining employment at a pizza restaurant), and was discharged from therapy in January 2022 for a failure to meaningfully engage in the process.

{¶4} In November 2020, the court placed De.R. and Di.R. in the temporary custody of HCJFS, and in January 2021, it extended temporary custody. In March 2021, the court awarded Mother unsupervised visitation with Di.R., which it expanded in April 2021. But the child was ultimately removed from the home during an unsupervised visit due to neglect, and HCJFS subsequently suspended unsupervised visitation. De.R. primarily resided in residential treatment facilities and group homes based on a variety of mental health challenges, while Di.R. resided in foster care. In November 2021, HCJFS filed for permanent custody of De.R. and Di.R.

{¶5} On March 1, 2022, Da.R. was born prematurely. Mother hid the pregnancy from HCJFS and received minimal prenatal care. The juvenile court granted HCJFS's ex parte emergency order for custody of Da.R. once the agency discovered his birth. And a few days later, it granted HCJFS interim custody of the child.

{¶6} In August 2022, HCJFS approved a home study for the children's great aunt. All three children were initially placed with their great aunt, but De.R.'s mental health issues escalated, resulting in several calls to the mobile crisis center. De.R. was eventually placed at Cincinnati Children's Hospital Medical Center College Hill Mental Health Facility. Di.R. and Da.R.'s placement was also disrupted because HCJFS

learned that Di.R. was missing kindergarten. The great aunt eventually concluded that she was no longer interested in adopting the children. Di.R. and Da.R. accordingly returned to foster care, placed with the same foster family.

{¶7} In January 2023, Da.R. was adjudicated dependent. In February 2023, the juvenile court held a trial on HCJFS's motion for permanent custody of De.R. and Di.R. and for its dispositional request of permanent custody of Da.R. The state called two witnesses: Ms. Davis, a National Youth Advocate Program ("NYAP") team lead who served as Mother's therapist from September 2021 through January 2022, and Ms. McCarty, an HCJFS employee who served as the ongoing case worker. Ms. Davis testified that Mother consistently attended therapy (during her enrollment) but that she did not make much, if any, progress toward reunification given her refusal to discuss her children. Ms. McCarty testified to the children's placement history and the agency's ongoing concerns, including visitation, the children's special needs, Mother's mental health and cognitive abilities, and her recent periods of incarceration. HCJFS also tendered nine exhibits. Over objections from De.R.'s counsel, the court admitted exhibits 1-4 and 6-9, which included the DAF assessment, NYAP assessments, and the domestic violence records involving Mother's previous partner. These exhibits showed Mother's history of "mild mental retardation," a learning disorder, "borderline intelligence," difficulty with short-term memory, a traumatic brain injury, and cognitive impairments regarding memory and attention.

{¶8} Ultimately, in April 2023, the magistrate granted permanent custody of all three children to HCJFS. Upon reviewing the magistrate's decision and considering Mother's objections, the juvenile court adopted the magistrate's decision. Mother now appeals.

4

II.

{¶9}   On appeal, Mother raises three assignments of error: (1) the juvenile court erred in awarding permanent custody, (2) the court erred when it allowed testimony of Mother's cognitive ability, and (3) Da.R. should not have been removed from Mother and Mother's therapeutic services were prematurely terminated.  For ease of the analysis, we address the first assignment of error last.

A.

{¶10}  In her second assignment of error, Mother contends that the juvenile court erred when it admitted and relied upon testimony conveying Mother's cognitive ability and speculated delays.  Specifically, she argues that Ms. McCarty's statements constituted expert testimony pursuant to Evid.R. 702, and because Ms. McCarty was not identified as an expert witness, Mother maintains that she could not qualify to testify in that capacity.

{¶11}  During the permanency trial, Ms. McCarty testified that: (1) the agency had concerns regarding Mother's "cognitive abilities and ability to meet the children's needs" and (2) "The psychological assessment found that [Mother] functions at a second grade level. She [h]as sever[e] cognitive delays as well as mental health concerns and a traumatic brain injury. I believe all three of these affect her ability to meet the children's basic needs, especially – and all the children's special needs since all three of them have special needs, including medical and mental health concerns."  No parties objected to the admission of the first statement at trial.  The attorney appointed to represent De.R. objected to the admission of the second statement, but Mother did not join in that objection.

5

**{¶12}** We typically review the court's admission of lay testimony for an abuse of discretion. *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, ¶ 20 ("Decisions regarding the admissibility of evidence are within the broad discretion of the trial court."). But because Mother failed to join in the objection, she forfeited all but plain error review. *See State v. Jewett*, 10th Dist. Franklin No. 11AP-1028, 2013-Ohio-1246, ¶ 40, citing *State v. Crosky*, 10th Dist. Franklin No. 06AP-816, 2007-Ohio-6533, ¶ 23, fn. 3 (noting an "[a]ppellant's failure to object, notwithstanding her co-defendant's objection, waives all but plain error"); Juv.R. 40(D)(3)(b)(iv) ("Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion * * * unless the party has objected to that finding or conclusion."). "Generally, plain error only applies in situations in which the error ' "seriously affects the basic fairness, integrity, or public reputation of the judicial process[.]" ' " *In re C Children*, 1st Dist. Hamilton Nos. C-190650 and C-190682, 2020-Ohio-946, ¶ 18, quoting *In re J.W.*, 1st Dist. Hamilton No. C-190189, 2019-Ohio-2730, ¶ 7, quoting *In re Etter*, 134 Ohio App.3d 484, 492, 731 N.E.2d 694 (1st Dist.1998).

**{¶13}** Pursuant to Juv.R. 34(I), the rules of evidence apply during a hearing on a motion for permanent custody. *See In re A.E.*, 10th Dist. Franklin Nos. 19AP-782, 19AP-783 and 19AP-784, 2021-Ohio-488, ¶ 46. "[L]ay opinion testimony must be 'rationally based on the perception of the witness. Perception connotes sense: visual, auditory, olfactory, etc. Thus, opinion testimony under Evid.R. 701 must be based on firsthand, sensory [] knowledge.' " *Collier v. Bayless*, 2d Dist. Montgomery No. 27958, 2018-Ohio-3922, ¶ 30, quoting *Sec. Natl. Bank & Trust Co. v. Reynolds*, 2d Dist. Greene No. 2007 CA 66, 2008-Ohio-4145, ¶ 17; *see* Evid.R. 701.

{¶14} Here, HCJFS did not present Ms. McCarty—the family's case worker—as an expert. In her capacity as case worker, Ms. McCarty observed Mother firsthand during supervised visitation. She shared that some of Mother's behavior during visits generated concerns about Mother's cognitive ability and, ultimately, her ability to care for the children. But Ms. McCarty did not have firsthand knowledge regarding the psychological assessment or the traumatic brain injury diagnosis to which she testified. And further, the psychological assessment was conducted by an outside agency, not HCJFS.

{¶15} But with our review limited to plain error, we hold that Mother does not satisfy this high burden. In this case, the challenged statements are cumulative of other evidence provided at trial—including psychological reports admitted at trial (to which Mother did not object at trial nor contest on appeal) that demonstrate her history of "mild mental retardation," a learning disorder, "borderline intelligence," difficulty with short-term memory, a history of a traumatic brain injury, and cognitive impairments regarding memory and attention.

{¶16} Accordingly, in light of the record, the admission of the testimony at trial does not constitute plain error, as it largely overlaps with other admitted (and not objected to) evidence. Therefore, we overrule Mother's second assignment of error.

B.

{¶17} In Mother's third assignment of error, she maintains (1) that Da.R. should not have been removed from her care, and (2) that he was not in custody of HCJFS for 12 months before the agency stopped her therapeutic services.

{¶18} Mother failed to raise these issues in her objections to the magistrate's decision granting permanent custody of Da.R. to HCJFS. Consequently, she waived

7

all but plain error review. *In re L.S.*, 5th Dist. Richland No. 2022 CA 00054, 2022-Ohio-3811, ¶ 36; Juv.R. 40(D)(3)(b)(iv). As noted above, we generally limit plain error to "situations in which the error ' "seriously affects the basic fairness, integrity, or public reputation of the judicial process[.]" ' " *In re C Children*, 1st Dist. Hamilton No. C-190650 and C-190682, 2020-Ohio-946, at ¶ 18, quoting *In re J.W.*, 1st Dist. Hamilton No. C-190189, 2019-Ohio-2730, at ¶ 7, quoting *In re Etter*, 134 Ohio App.3d at 492, 731 N.E.2d 694.

{¶19} Regarding the removal issue, at the interim custody hearing, Mother stipulated that she did not oppose the request for interim custody. She was represented by counsel at this hearing, and based on the record, we have no reason to believe the stipulation was not knowing and voluntary. The court relied on this stipulation (along with the evidence provided and the best interest of the child) in its decision to grant interim custody to HCJFS. Thus, the removal of Da.R. does not constitute plain error.

{¶20} Turning to the termination of Mother's therapeutic services, she contests that HCJFS stopped her therapy sessions before the birth of Da.R. Although Mother does not explicitly challenge the juvenile court's reasonable efforts finding, we interpret this issue as an argument that HCJFS failed to make reasonable efforts towards reunification under R.C. 2151.419.

{¶21} Pursuant to R.C. 2151.419(A)(1), HCJFS must make "reasonable efforts * * * to make it possible for the child to return safely home." " 'In a reasonable efforts determination, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute.' " *In re J.L.*, 1st

Dist. Hamilton No. C-210586, 2022-Ohio-2885, ¶ 16, quoting *In re Wayne Y.*, 6th Dist. Lucas No. L-07-1259, 2008-Ohio-245, ¶ 18.

{¶22} Mother insists that HCJFS failed to make reasonable efforts to reunite her with Da.R. because it terminated her therapeutic services in January 2022, prior to Da.R.'s birth in March 2022. Mother initially engaged in the therapeutic services coordinated by HCJFS, but after her first therapist left, she refused to discuss her children during therapy. Her second therapist testified that her progress stalled, and that there was not substantial enough progress for her to remain in the program based on the boundaries created by Mother. Because Mother refused to discuss her children and HCJFS no longer believed reunification was possible, it terminated her therapeutic services. HCJFS continued to provide visitation services, case management, and bus cards. Mother does not explain how she would have engaged differently in therapeutic services following the birth of Da.R., and she was incarcerated for two periods following Da.R.'s birth, which made it difficult for her to engage in the services HCJFS offered, such as visitation. Ultimately, surveying this record, the magistrate found that HCJFS made reasonable efforts aimed at reunification.

{¶23} Based upon this record, we see nothing that satisfies the high burden of plain error based on the removal of Da.R. or the termination of certain services. Thus, we overrule Mother's third assignment of error.

C.

{¶24} Turning to the ultimate termination decision, Mother contests the juvenile court's decision to grant permanent custody of De.R., Di.R., and Da.R. to HCJFS, challenging the best interest finding on both sufficiency and manifest weight

grounds. "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when ' "the evidence is legally sufficient to support the [] verdict as a matter of law." ' " *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, 874 N.E.2d 1198, ¶ 3, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). And when reviewing a grant of permanent custody to HCJFS, we "tak[e] a fresh look at the evidence to see whether it clearly and convincingly supports the court's decision." *In re M/E*, 1st Dist. Hamilton No. C-200349, 2021-Ohio-450, ¶ 8, citing *In re C Children*, 1st Dist. Hamilton Nos. C-190650 and C-190682, 2020-Ohio-946, at ¶ 8.

{¶25} When reviewing for manifest weight, however, this court "must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re Z.C.*, Slip Opinion No. 2023-Ohio-4703, ¶ 14, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. In weighing the evidence, we "must always be mindful of the presumption in favor of the finder of fact." *Id.*, citing *Eastley* at ¶ 21.

{¶26} After successfully obtaining temporary custody following an R.C. 2151.353(A)(2) abuse, neglect, or dependency adjudication, HCJFS sought permanent custody pursuant to R.C. 2151.413(A). The juvenile court should only grant an agency's motion for permanent custody if it finds, by clear and convincing evidence, that: (1) one of the conditions in R.C. 2151.414 (B)(1)(a) through (e) is satisfied, and (2) it is in the child's best interest, pursuant to the factors listed in subsection (D)(1). *See* R.C.

2151.414 (B)(1), (D)(1); *In re F.B.*, 1st Dist. Hamilton No. C-200320, 2020-Ohio-5610, ¶ 17-18.

{¶27} On appeal, Mother contests only the second prong of the permanent custody analysis—whether the juvenile court's finding that awarding HCJFS permanent custody of the children is in the best interest of the children. The first prong—one of the conditions in R.C. 2151.414(B)(1)(a) through (e)—was clearly satisfied for De.R. and Di.R. as the children were in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period when the agency filed the motion to modify temporary custody to permanent custody. *See* R.C. 2151.414(B)(1)(d). At the time of filing, Da.R. had not been in HCJFS custody for 12 months, and based on the evidence contained in the record, it is unclear if any of the R.C. 2151.414(B)(1) conditions were satisfied regarding Da.R. But because Mother does not advance this argument, we must limit our review to the second prong. Accordingly, we proceed to the best interest analysis under R.C. 2151.414(D)(1) for all three children.

{¶28} In conducting the best interest analysis, "R.C. 2151.414(D)(1) requires that a court consider all relevant factors, including those delineated in R.C. 2151.414(D)(1)(a) through (e)." *In re Z.W.*, 1st Dist. Hamilton No. C-200061, 2020-Ohio-3100, ¶ 17. But "no single factor is given greater weight or heightened significance." *In re P. & H.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 35, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

{¶29} The court first considered R.C. 2151.414(D)(1)(a), which evaluates the children's interaction and relationship with their "parents, siblings, relatives, foster

11

caregivers and out-of-home providers, and any other person who may significantly affect the child[ren]." R.C. 2151.414(D)(1)(a). The court acknowledged that Mother loves her children, and that De.R. and Di.R. love her and are happy to see her. The case worker testified that Da.R. has less of a relationship with Mother than the other children because he was removed from her care shortly after birth. The court expressed its concerns regarding her interactions with the children given her mental health issues, her cognitive abilities, and her struggle to understand De.R.'s mental health needs.

{¶30} Because of mental health concerns and an intellectual disability, De.R. has primarily resided in residential treatment facilities or group homes since her removal from Mother's home. Di.R. and Da.R. reside together in a foster home. They are bonded to each other and to their current foster parents, and they get along with the three other children in the home. Di.R. and Da.R.'s current foster family expressed their desire to adopt both children, and HCJFS was working to secure a group home placement for De.R. who, at the time of trial, received in-patient mental health services at Cincinnati Children's Hospital.

{¶31} Next, the court considered the children's wishes. *See* R.C. 2151.414(D)(1)(b). During the trial, the attorney appointed to represent De.R.'s interests indicated that she wished to return home to Mother. De.R., age 13, however, changed her mind, and at the hearing on the objections, her counsel indicated that she did not wish to return to Mother's custody and that she supported the grant of permanent custody to HCJFS. Di.R., age five, and Da.R., age 11 months, were too young to express their wishes. The court acknowledged that their guardian ad litem recommended a grant of permanent custody to HCJFS as in their best interest. *See*

R.C. 2151.414(D)(1)(b) (noting the juvenile court should consider "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child").

{¶32} Turning to the custodial history of the children, *see* R.C. 2151.414(D)(1)(c), the evidence established that De.R. and Di.R. were removed from Mother's home in November 2019, and at the time of trial, they had been in HCJFS custody for three years and three months. Regarding Da.R., the evidence established that he was placed in HCJFS care three days after his birth, and at the time of the hearing, he had been in the custody of HCJFS for 11 months.

{¶33} Thereafter, the court considered the children's "need for a legally secure permanent placement and whether that type of placement [could] be achieved without a grant of permanent custody to [HCJFS]." R.C. 2151.414(D)(1)(d). The record demonstrates that while Mother progressed to unsupervised expanded visitation with Di.R. earlier in the family's case, Di.R. had to be removed from Mother's home during a visit. Consequently, HCJFS terminated unsupervised visitation, and since that time, Mother did not progress beyond supervised visitation with any of the children. Mother was incarcerated twice during the pendency of this case, and consequently, she was unable to visit with the children during periods of summer 2022 and winter 2023.

{¶34} The record also details concerns regarding Mother's mental health and cognitive abilities, including NYAP reports from 2019 and 2020 detailing her struggles with PTSD, depression, anxiety, paranoia, a traumatic brain injury, mood swings, memory and attention impairment, and suspected cognitive delays. Although Mother initially engaged in therapy, her progress stalled, and she was ultimately discharged

13

from therapy due to her lack of progress towards reunification and unwillingness to discuss her children.

{¶35} De.R. and Di.R. both have significant behavioral and mental health needs and have been diagnosed with PTSD. De.R. has received care for suicidal and homicidal ideation in numerous residential facilities throughout this case. The NYAP reports provide that Mother lacked age-appropriate insight and judgment into the nature of mental illness. Additionally, Da.R. has significant health needs requiring medical appointments and physical therapy. Based on this evidence, the juvenile court found that Mother cannot meet the needs of the children.

{¶36} Finally, R.C. 2151.414(D)(1)(e) requires the court to consider whether any factor listed in R.C. 2151.414(E)(7) through (11) applies. The court considered all of these factors and found none of them applied to Mother.

{¶37} The record demonstrates that the juvenile court properly considered the relevant statutory factors and weighed the factors to find it is in the best interest of De.R., Di.R., and Da.R. to be placed in the permanent custody of HCJFS. Based on these facts, the juvenile court's best interest finding was supported by sufficient evidence and was not against the manifest weight of the evidence. Accordingly, we overrule Mother's first assignment of error.

\* \* \*

{¶38} In light of the foregoing analysis, we overrule Mother's assignments of error and affirm the judgment of the juvenile court.

Judgment affirmed.

**BOCK, P.J.,** and **WINKLER, J.,** concur.

14

Please note:

The court has recorded its entry on the date of the release of this opinion.