[Cite as *In re N. Children*, 2024-Ohio-1492.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: N CHILDREN

:      APPEAL NO. C-240061
         TRIAL NO. F10-639Z

:

:      *O P I N I O N.*

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: April 19, 2024

*Alana Van Gundy*, for Appellant Father,

*Raymond T. Faller*, Hamilton County Public Defender, and *Allison Smith*, Assistant Public Defender, Appellee Guardian Ad Litem for the minor children,

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services.

**BERGERON, Judge.**

{¶1} In this parental termination case, Mother and appellant Father (together "Parents") love their children, but the record contains abundant evidence of concerns regarding their ability to care for them, including their failure to consistently attend visitation (at one point, Parents failed to visit with their children for more than 90 days), to comply with drug screens, and to manage their children's complex demands (including health challenges) together with Mother's cognitive challenges and limitations. Accordingly, appellee Hamilton County Department of Job and Family Services ("HCJFS") sought permanent custody, which the juvenile court granted. Although Parents remain in a romantic relationship and reside together, only Father contests the court's grant of permanent custody in this appeal. Based on a thorough review of the record, the applicable law, and the arguments raised, however, we are not persuaded by his argument. We accordingly affirm the juvenile court's grant of permanent custody of the children to HCJFS.

I.

{¶2} This case involves Parents and three of their shared minor children, A.N., D.N., and Z.N. The family has a long history of involvement with HCJFS, beginning with Mother's two older children (Father signed a paternity affidavit for the younger of the two children) who were ultimately placed in legal custody of a family member. But HCJFS's involvement in this case began in December 2019 when healthcare workers expressed concerns regarding Mother's ability to care for A.N. following her birth. A.N. was quickly placed in the interim custody of HCJFS.

{¶3} Initially, HCJFS's primary concern stemmed from the impact of Mother's cognitive limitations and lack of emotional regulation on her ability to

parent A.N. But as the case progressed, additional concerns regarding Parents' abilities to care for the children arose. The agency received numerous reports of domestic abuse between Mother and Father, and while there was little evidence to substantiate any physical abuse, evidence emerged of frequent verbal altercations, including a situation at visitation where law enforcement intervened. Additionally, a previous domestic violence incident occurred between Father and his mother (the children's paternal grandmother), which resulted in his incarceration. Father is also a convicted sex offender—for an incident involving a child younger than age 13— with a registration requirement of 25 years.

**{¶4}** With A.N. in its temporary custody, the agency developed a case plan as part of its effort to reunite the family. Parents pursued reunification together. The case plan included the following services for Mother: a diagnostic assessment, a psychological assessment, parenting education, a parenting capacity assessment, toxicology screens, Developmental Disabilities Services ("DDS"), and visitation. And regarding Father, the case plan included: a diagnostic assessment, parenting education, toxicology screens, and visitation. The agency also required Parents to establish stable housing and income.

**{¶5}** A.N. was adjudicated dependent in September 2020. And in March 2021, Father progressed to unsupervised visitation with A.N. Father was not allowed to leave the child unsupervised with Mother during the visits.

**{¶6}** In July 2021, D.N. was born to Parents. Mother tested positive for marijuana at the time of his birth. HCJFS was awarded interim custody of the child. And in September 2021, D.N. was adjudicated dependent.

{¶7} A few months later, in November 2021, HCJFS filed for permanent custody of A.N. In March 2022, the magistrate awarded Father legal custody of D.N. with orders of protective supervision. But HCJFS and the children's guardian ad litem ("GAL") promptly filed objections, and the court overruled the magistrate's decision and granted HCJFS temporary custody of D.N.

{¶8} In June 2022, Z.N. was born to Parents. Again, Mother tested positive for marijuana at the time of the child's birth, and HCJFS received interim custody of Z.N. Prompted by Mother's reports of domestic and sexual abuse, Father's unsupervised visits with A.N. were terminated in October 2022, and Father did not progress past supervised visitation with any of the children since that time. The agency moved for permanent custody of D.N. and amended its complaint to seek permanent custody of Z.N. in November 2022. And Z.N. was adjudicated dependent in January 2023.

{¶9} The permanency trial for all three children began in February 2023 and concluded in April 2023. HCJFS called six witnesses: the children's paternal grandmother, one of the children's foster caregivers, Dr. Barbara Bergman (a forensic psychologist), Melissa Hadley (a Beech Acres Service Parenting Center team lead), Madison Huffman (the family's HCJFS case worker), and Father.

{¶10} The paternal grandmother shared her concerns about Mother and Father's relationship and noted her relationship with the children. The foster caregiver explained the children's complex medical needs (all three children are being monitored for cerebral palsy, and Z.N. has a skull condition which will require invasive surgery and an intensive recovery), the children's bond with the foster parents and other children in the home, Parents' visitation history and his

observations concerning visitation, his communication with Parents, and phone calls he received from Mother. Dr. Bergman attested to her struggles to get in contact with HCJFS, Mother's failure to complete the parenting evaluation, and her recommendation that Father complete a sex offender risk assessment based on his criminal history. Ms. Hadley testified to her observations of Parents during visitation, Father's attentiveness to the needs of the children, and Parents' visitation history from July 2022 through September 2022. Ms. Huffman shared her observations of and communication with Parents, the agency's concerns about Parents, and the children's bond with Parents. And finally, Father communicated his employment history and housing status, shared his desire to reunite with the children, and explained his inconsistent visitation history and refusal to complete drug screening. He was also questioned regarding Mother's ability to parent the children.

{¶11} HCJFS tendered 14 exhibits, including Mother's psychological assessment, letters from Dr. Bergman (indicating her inability to complete Mother's parenting assessment), certified no shows to Mother's and Father's drug screens, a certified eviction record, Mother's lease, Family Nurturing Center and Beech Acres visitation records, recordings of phone calls between Mother and Ms. Huffman and Mother and the foster caregiver, and a log of bus tickets distributed to Parents.

{¶12} Ultimately, in July 2023, the magistrate granted permanent custody of all three children to HCJFS. Mother and Father separately objected to the decision. Upon reviewing the magistrate's decision and hearing Mother's and Father's objections, the juvenile court overruled all objections and adopted the magistrate's decision. Father now appeals (Mother did not file an appeal).

5

II.

**{¶13}** In his sole assignment of error, Father contests the juvenile court's ultimate decision to grant permanent custody of his three minor children A.N., D.N., and Z.N. to HCJFS, challenging the decision on both sufficiency and manifest weight grounds. "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when ' "the evidence is legally sufficient to support the [] verdict as a matter of law." ' " *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, 874 N.E.2d 1198, ¶ 3, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). To review for sufficiency, we "tak[e] a fresh look at the evidence to see whether it clearly and convincingly supports the court's decision." *In re M/E*, 1st Dist. Hamilton No. C-200349, 2021-Ohio-450, ¶ 8, citing *In re C Children*, 1st Dist. Hamilton Nos. C-190650 and C-190682, 2020-Ohio-946, ¶ 8.

**{¶14}** But when reviewing for manifest weight, we "must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re Z.C.*, Slip Opinion No. 2023-Ohio-4703, ¶ 14, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. As we weigh the evidence, we "must always be mindful of the presumption in favor of the finder of fact." *Id.*, citing *Eastley* at ¶ 21.

**{¶15}** After successfully obtaining temporary custody following an R.C. 2151.353(A)(2) abuse, neglect, or dependency adjudication, HCJFS sought permanent custody of the children pursuant to R.C. 2151.413(A). "The juvenile

court should only grant an agency's motion for permanent custody if it finds, by clear and convincing evidence, that: (1) one of the conditions in R.C. 2151.414 (B)(1)(a) through (e) is satisfied, and (2) it is in the child's best interest, pursuant to the factors listed in subsection (D)(1)." *In re De.R.*, 1st Dist. Hamilton No. C-230685, 2024-Ohio-1183, ¶ 26, citing R.C. 2151.414(B)(1) and (D)(1); *In re F.B.*, 1st Dist. Hamilton No. C-200320, 2020-Ohio-5610, ¶ 17-18.

{¶16} On appeal, Father contests only the second prong of the permanent custody analysis: the juvenile court's finding that awarding HCJFS permanent custody of the children was in their best interest. The first prong—one of the conditions in R.C. 2151.414(B)(1)(a) through (e)—was clearly satisfied for all three children. Regarding A.N. and D.N., the children were in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period when the agency filed the motion to modify temporary custody to permanent custody. *See* R.C. 2151.414(B)(1)(d). And although, at the time of filing, Z.N. had not yet been in HCJFS custody for 12 months, based on the evidence contained in the record and the juvenile court's finding of abandonment under R.C. 2151.414(E)(10), he "[could] not be placed with either of [his] parents within a reasonable time or should not be placed with [his] parents." R.C. 2151.414(B)(1)(a).

{¶17} Turning to the second prong of the permanent custody analysis, the best interest analysis, "R.C. 2151.414.(D)(1) requires that a court consider all relevant factors, including those delineated in R.C. 2151.414(D)(1)(a) through (e)." *In re Z.W.*, 1st Dist. Hamilton No. C-200061, 2020-Ohio-3100, ¶ 17. "No single factor is given greater weight or heightened significance." *In re P. & H.*, 1st Dist. Hamilton Nos. C-

190309 and C-190310, 2019-Ohio-3637, ¶ 35, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

{¶18} The court first considered R.C. 2151.414(D)(1)(a), which evaluates the children's interactions and relationships with their "parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child[ren]." R.C. 2151.414(D)(1)(a). All three children reside together in a foster home and were placed with their foster caregivers shortly after birth. The children are bonded to each other, their foster caregivers, and the other children in the home. Testimony established that the children's foster caregivers consistently meet their complex medical needs and are willing to be a permanent placement for the children.

{¶19} Father expressed his desire to reunite with the children. The record demonstrates that Father appears eager to visit the children and, during visits, he is patient with and attentive to the children. But Father failed to consistently attend visitation and struggled meeting the needs of the children simultaneously with Mother's extensive needs.

{¶20} Mother also expressed a desire to be reunited with the children. The record establishes concerns about her ability to parent the children and provide adequate care due to her mental health and cognitive limitations. Yet Father testified that he does not have concerns about Mother's ability to parent the children.

{¶21} At trial, witnesses also expressed concerns regarding the children's relationship with Parents. The foster caregiver testified that D.N. does not want to leave when the visitation transportation arrives and is clingy when he returns from

8

visits. And Ms. Huffman shared that she has concerns about the bond between the children and Parents, specifically noting that A.N. did not want to hug Parents or say goodbye at the end of a visit.

{¶22} Further, Father failed to consistently visit the children, raising concerns about his bond with them. The record demonstrates multiple gaps in visitation and establishes that Parents often ended visits early, preventing the children from getting into a routine and building their relationships with Father. Most recently, Father failed to visit the children from November 2022 to February 2023. And between February 2023 and April 2023, Father attended visitation twice and ended both visits early.

{¶23} The court also considered the children's relationships with other family members. The paternal grandmother's testimony established that she is seeking visitation with the children and had visited them twice at the time of trial. She is not seeking custody but indicated that she wants the children to build a relationship with their family. Father testified that maternal grandmother lives nearby and that Mother's niece and sister could help with the children. But none of Mother's family testified, and the record does not contain any evidence of their relationships with the children.

{¶24} Next, the court considered the children's wishes. *See* R.C. 2151.414(D)(1)(b). The children were too young to express their wishes. But the court acknowledged that their GAL recommended a grant of permanent custody to HCJFS as in their best interest. *See* R.C. 2151.414(D)(1)(b) (noting the juvenile court should consider "[t]he wishes of the child, as expressed directly by the child

or through the child's guardian ad litem, with due regard for the maturity of the child").

**{¶25}** Regarding the children's custodial history, *see* R.C. 2151.414(D)(1)(c), the evidence established that all three children were removed from Parents' care and placed in their foster home within a week of birth. At the time of the trial, A.N. had been in HCJFS custody for more than three years, D.N. had been in HCJFS custody for about one and a half years, and Z.N. had been in HCJFS custody for approximately eight months.

**{¶26}** Thereafter, the court considered the children's "need for a legally secure permanent placement and whether that type of placement could be achieved without a grant of permanent custody to [HCJFS]." R.C. 2151.414(D)(1)(d). As part of their case plan, Parents were required to have stable housing and income. Parents reside together, but only Mother is the leaseholder as she receives a subsidy for housing, raising concerns about Father's housing stability. Mother was evicted once previously, but at the time of trial, Parents had resided in Mother's new apartment for several months.

**{¶27}** Father did not maintain long-term employment throughout the duration of the case. He was fired from Rally's, temporarily worked for Dunkin Donuts, and experienced long stretches of unemployment. And at the time of the trial in April 2023, Father had been without employment for at least four months and was interviewing for jobs. In a subsequent written filing, Father indicated (without any substantiation) that he was employed. But considering the evidence establishing his tumultuous employment history, the court noted its concerns with Father's job security, especially in light of his criminal record.

{¶28} The record demonstrates that while Father had unsupervised visitation with A.N. at one point, he never progressed beyond supervised visitation with the other children. And he showed an overall lack of consistent visitation with the children.

{¶29} Additionally, the record raises concerns about Father's ability to recognize and adequately address Mother's cognitive deficiencies. Father testified that he does not have concerns regarding Mother's ability to parent the children. And while he suggested that Mother's niece and sister could help with the children when he was not home and that there is a daycare down the street, he did not share any specific plans for childcare, either in terms of the family members' availability or any planned enrollment in daycare.

{¶30} Based on the record, there is also conflicting evidence regarding Father's ability to parent the children. Ms. Hadley testified that she observed that Father was attentive to the children's needs during visitation. But the foster caregiver testified that on multiple occasions Parents requested that he pick up A.N. early from unsupervised visitation. And she was crying, cold, and hungry upon pickup. The record also detailed instances where Parents requested that he get the children early from supervised visitation. He stated that the children were often hungry after visits, raising concerns about how frequently and what they were fed during visits, and that the children often had full or leaking diapers at visit pickup. Ms. Huffman testified that during a supervised visit, Parents requested that she change the diapers of all three children.

{¶31} The court also noted concerns about Father's physical health, given testimony and evidence establishing his frequent cancelled visitations and

toxicology screens due to illness. Ms. Huffman indicated that one visit was cancelled because Father fainted and was taken to the hospital, and she noted that there were some concerns with his heart. And on the day of the April 6, 2023 hearing, Father shared that he was hospitalized earlier that morning. Father testified that he does not have any physical health concerns, and although requested by HCJFS, he failed to submit any documentation of the illnesses resulting in cancelled visitation.

{¶32} Finally, R.C. 2151.414(D)(1)(e) requires the court to consider whether any factor listed in R.C. 2151.414(E)(7) through (11) applies. In relation to Father, the court determined that (E)(10) applies because Father abandoned the children when he did not visit with them between November 15, 2022 and February 14, 2023, which exceeded the 90-day statutory definition of abandonment. *See* R.C. 2151.011(C).

{¶33} The record demonstrates that the juvenile court properly considered the relevant best interest factors and weighed the factors to conclude that it is in the best interest of A.N., D.N., and Z.N. to be placed in the permanent custody of HCJFS. Accordingly, we hold the court's best interest finding was supported by sufficient evidence and was not against the manifest weight of the evidence.

\* \* \*

{¶34} In light of the record and the foregoing analysis, we overrule Father's sole assignment of error and affirm the judgment of the juvenile court.

Judgment affirmed.

**BOCK, P.J.,** and **WINKLER, J.,** concur.

12

Please note:

The court has recorded its entry on the date of the release of this opinion.