[Cite as *In re S.H.*, 2025-Ohio-2338.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: S.H. AND Y.H             :        APPEAL NO.   C-250137
                                         TRIAL NO.    F/05/3098 Z
                                :

                                :        *JUDGMENT ENTRY*


This cause was heard upon the appeal, the record, and the briefs.

The judgment of the trial court is affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 7/2/2025 per order of the court.**


**By:**_____
        **Administrative Judge**

[Cite as *In re S.H.*, 2025-Ohio-2338.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: S.H. AND Y.H. | : | APPEAL NO. C-250137 |
| | | TRIAL NO. F/05/3098 Z |
| | : | |
| | : | *O P I N I O N* |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: July 2, 2025

*Christopher P. Kapsal*, for Appellant Father,

*Adams Law, PLLC*, and *Aaren E. Meehan*, for Appellee Mother,

*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Masha Pupko*, Assistant Public Defender, for Appellee Guardian Ad Litem.

**Bock, Judge.**

**{¶1}** In this appeal, Father challenges the juvenile court's judgment granting the Hamilton County Department of Job and Family Services ("HCJFS") permanent custody of his children, Y.H. and S.H. Father asserts that the juvenile court's judgment is not supported by sufficient evidence and is against the weight of the evidence.

**{¶2}** We overrule the assignment of error and hold that the judgment was supported by sufficient evidence and was not against the manifest weight of the evidence. Despite his case plan requiring periodic drug screenings, Father failed to attend any screenings. Moreover, he was indicted on felony drug-trafficking charges during the pendency of the case. This was sufficient evidence to support the juvenile court's findings that the children could not or should not be placed with Father and that awarding HCJFS permanent custody of the children was in their best interest.

**{¶3}** We accordingly affirm the juvenile court's judgment.

### I.    *Factual and Procedural History*

### <u>Y.H.</u>

**{¶4}** In July 2022, HCJFS moved for interim custody of Y.H., a newborn girl, after Y.H. tested positive for fentanyl, cocaine, and buprenorphine at birth. HCJFS noted that Y.H.'s mother ("Mother") had two prior children removed from her custody due to her substance abuse. In its complaint for custody, HCJFS identified Father as Y.H.'s alleged father.

**{¶5}** The trial court granted HCJFS interim custody of Y.H. in July 2022 and adjudicated Y.H. abused and dependent in October 2022. The juvenile court journalized a case plan for reunification. The juvenile court's January 2023 order noted that Mother and Father had been unresponsive with HCJFS and had not participated in case-plan services or visited with Y.H.

3

**{¶6}** In June 2023, HCJFS moved for permanent custody of Y.H. Later that month, Father filed a petition for permanent custody of Y.H.

**S.H.**

**{¶7}** In September 2023, Mother gave birth to S.H. The juvenile court granted an emergency ex parte order placing S.H. in HCJFS's custody because he tested positive for cocaine and buprenorphine. In October 2023, HCJFS filed a complaint for temporary custody of S.H., and later amended the complaint to seek permanent custody. The juvenile court adjudicated S.H. abused, neglected, and dependent in April 2024.

**Custody Hearing**

**{¶8}** A magistrate held a consolidated hearing on HCJFS's motion for permanent custody of Y.H. and its complaint for permanent custody of S.H.

Caseworker testimony

**{¶9}** Bailey Brown, an HCJFS caseworker, handled Y.H. and S.H.'s case. Brown explained that Y.H. came into the court system after she tested positive for several substances at birth. Brown initially testified that the case plan was the same for Mother and Father. Both were required to complete a diagnostic assessment of functioning ("DAF"), follow all treatment recommendations, take parenting classes, submit to random toxicology screenings, participate in visitation, obtain stable housing and income, and attend monthly meetings with a caseworker. Brown later clarified that the case plan did not require Father to take parenting classes as Father's actions provided no basis to believe classes were necessary. Brown agreed that the case plan was the same for Mother and Father despite Brown not observing or suspecting Father of being under the influence of any substances.

**{¶10}** Brown testified that at the beginning of the case, Father did not

participate in any case-plan services. She explained that "he was waiting on paternity to be established for [Y.H.] before he would participate." Brown stated that after "six-ish months," Father began participating and completed a DAF. The DAF assessor had no recommendations for Father.

{¶11} Father began visiting Y.H. around November 2023 and was "pretty consistent." Brown testified that the parents' visitation level was "facilitated." (No one defined "facilitated," but the context suggests that it means visits were held at the Family Nurturing Center ("FNC") and an employee remained in the room to supervise the family.) The supervision level did not change over the course of the case. Father's conduct during the visits was appropriate and Brown had no evidence that Father posed a danger to the children. In March 2024, Father told Brown that he was looking for housing.

{¶12} Brown arranged drug screenings for Father, but he did not attend any of them. Father told Brown that, on some of the occasions, he had other obligations that prevented him from making the screenings and that "transportation was an issue." Brown arranged transportation for Father to attend the screenings; nevertheless, Father failed to attend any screens.

{¶13} Brown testified that in October 2022, HCJFS performed and approved a home study for a family member. But HCJFS decided not to place Y.H. with the family member because Y.H. had been placed with the same foster parent since July 2022 and the family member "didn't know a lot of the substance abuse issues that was going on" involving Mother.

{¶14} Brown testified that she believed Father might "allow[] Mother access to the children." She explained, "I never knew, like, what their relationship was. I know that getting to visits at the Family Nurturing Center, [they] would drive together."

5

Brown believed that Father did not recognize Mother's drug addiction as a problem. She explained that despite S.H. testing positive for controlled substances at birth, Father did not "express concern or an understanding about" Mother's substance abuse.

{¶15} Rachel Howell, an FNC floor and visitation supervisor, described an incident during a February 2024 visit between both parents and the children. While holding S.H., Mother appeared to have difficulty sitting up straight, was swaying in her chair, and her eyes were closing. Howell believed Mother "possibly could drop the baby," so she privately spoke with Mother and escorted her to the bathroom. Howell testified that Mother continued to appear disoriented, tired, and unsteady. When Mother exited from the bathroom, she threw something in a trashcan. Howell later retrieved the item—it was a syringe. Howell testified that Father "was very receptive" when she discussed Mother's behavior with him.

{¶16} Madelynn Yeager, an HCJFS caseworker, began working on the children's case beginning in May 2024. During Yeager's time assigned to the case, Father continued visiting with the children, but he did not appear for required drug screenings. Father lacked permanent housing: he stayed at his mother's house, a friend's house, or hotels "from time to time." Yeager did not know whether Father had stable housing at the time of the trial.

{¶17} Yeager testified that Y.H. and S.H. had lived with the same foster parent since their respective discharges from the hospital after their births. Yeager believed the children's foster parent was willing to adopt the children.

{¶18} Yeager did not believe that either Y.H. or S.H. could be reunified with either parent within a reasonable time because Mother was incarcerated, struggled with substance use, and lacked housing. As to Father, Yeager pointed to his lack of

6

drug-screen attendance. Yeager explained that Father's visitation privileges had not been expanded because Father had not attended drug screens and continued contact with Mother, including taking her to visits. Yeager testified that HCJFS would "have to see that [Father] can be protective of his children," including by acknowledging Mother's substance abuse and the need to appreciate the danger of having young children exposed to someone who is actively abusing substances." When asked what Father needed to do to get expanded visits, Yeager testified that she wanted him to continue to have visits and establish his sobriety by attending drug screens.

{¶19} Yeager testified that HCJFS has no internal services to address housing barriers and instead refers parents to outside services. When Yeager asked Father to provide proof of income, Father explained that he could not produce pay stubs because he was "paid under the table" on cash-transfer apps for remodeling and painting work. Yeager did not ask to see screenshots from the app or to have Father's employer's contact information.

{¶20} Between the first and second days of trial (about a month), the State charged Father with several felonies, including drug trafficking and aggravated possession of drugs. Father appeared at trial on both days, as he had posted bond.

Father's testimony

{¶21} At trial, Father agreed that he had not submitted to any drug screens. He explained, "I didn't see a reason for a drug test, but I was going to cooperate. But, at the same time, [HCJFS] wanted me to get gainful employment, find somewhere to live, which I was doing, and it just seemed like, you know, as far as our schedules wasn't coinciding." Father testified that he told Brown which days he was working or available, but "she just basically seemed to, you know, just set them when she wanted to set them."

**{¶22}** Father believed that his visits with Y.H. and S.H. were going well. He visited the children once a week at FNC for two hours. Father's visits were interrupted by his incarceration.

**{¶23}** Father stated that he recently obtained independent stable housing, but the caseworker had not come to view it. Although they had set a time for the caseworker to view the home, "that was kind of disrupted due to my situation."

**{¶24}** Father told the juvenile court that he wanted custody of his children. "I want them to be where, you know, they're developing and they're able to grow and where they're loved, and I believe – I know that they would get that if they were with me." He said his relationship with Mother was "[s]trained but we still communicate." If given custody of the children, Father would "not deny her to see her children . . . but I don't think I would let her come to the house to visit" and instead would let her see them somewhere public.

**{¶25}** When asked about Mother's behavior during the February 2024 visit (the visit where Howell found a syringe in the bathroom after witnessing Mother holding the baby while swaying in her chair with her eyes closing), Father explained that Mother was "like a night owl" and believed that she was simply tired and disoriented. He did not have any concerns with the way Mother was acting, but "when it was pointed out to me as far as her falling asleep, . . . I try to do my best to, you know, tell her like, hey, stand up, do something." Father did not believe Mother was under the influence of drugs at the visit because, "I don't think she would do that and come and see her children."

**{¶26}** Father had arranged to attend a 13-week tech-support training, to which he was referred through the juvenile court magistrate. But that training had been delayed due to his incarceration.

### The juvenile court granted HCJFS custody of both children

**{¶27}** The magistrate issued a decision granting permanent custody of Y.H. and S.H. to HCJFS. Father and Mother objected. The juvenile court overruled their objections and adopted the magistrate's decision in full. Only Father appealed.

## II.    Analysis

**{¶28}** In his sole assignment of error, Father asserts that the juvenile court erred in granting permanent custody of Y.H. and S.H. to HCJFS.

### A.  Standard of review

**{¶29}** We review the juvenile court's judgment awarding HCJFS permanent custody of the children under sufficiency-of-the-evidence and manifest-weight-of-the-evidence standards. *In re Z.C.*, 2023-Ohio-4703, ¶ 11. Though Father argues these issues together, "Sufficiency of the evidence and manifest weight of the evidence are distinct concepts and are '"both quantitatively and qualitatively different."'" *Id.* at ¶ 13, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

**{¶30}** A sufficiency-of-the-evidence review is "a test of adequacy" under which appellate courts ask whether there is legally sufficient evidence on each element necessary to support the judgment. *Id.*, quoting *Thompkins* at 386. A manifest-weight-of-the-evidence challenge, however, determines whether HCJFS met its burden of persuasion at trial. *State v. Hurt*, 2024-Ohio-3115, ¶ 95 (1st Dist.). We independently review the record, weigh the evidence, appraise witness credibility, and determine whether the juvenile court plainly went astray, creating a manifest miscarriage of

justice. *Id.*, quoting *State v. Kizilkaya*, 2023-Ohio-3989, ¶ 15 (1st Dist.), quoting *State v. Powell*, 2020-Ohio-4283, ¶ 16 (1st Dist.).

**{¶31}** Though a manifest-weight review requires us to independently weigh the evidence, we are mindful of the presumption in favor of the factfinder. *In re Z.C.,* 2023-Ohio-4703, at ¶ 14, quoting *Eastley*, 2012-Ohio-2179, at ¶ 21. "When confronted with conflicting evidence, we interpret the evidence in a manner consistent with the trial court's judgment." *State v. Rose*, 2024-Ohio-5689, ¶ 23 (1st Dist.). Courts afford this deference because factfinders personally observe witness testimony when making credibility determinations. *In re Z.C.* at ¶ 14.

### B. *Parental termination statutes*

**{¶32}** Parents' interest in their children's care, custody, and control has long been recognized by the Supreme Court of the United States as a fundamental liberty interest. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Supreme Court of Ohio has described terminating one's parental rights as "the family law equivalent of the death penalty in a criminal case." (Citations omitted.) *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). Courts must afford parents all substantive and procedural protections allowed by law. *Id.*

#### i. **R.C. 2151.353(A)(4)**

**{¶33}** The juvenile court's initial disposition for S.H. was granting permanent custody to HCJFS. R.C. 2151.353(A)(4) permits a juvenile court, after adjudicating a child abused, neglected, or dependent, to make an initial disposition granting permanent custody of a child to a public children services agency if it finds (1) under R.C. 2151.414(E), the child cannot be placed with a parent in a reasonable time or should not be placed with either parent, and (2) under R.C. 2151.414(D)(1), granting the agency permanent custody is in the child's best interest. Thus, when reviewing a

challenge to a juvenile court's permanent-custody decision under R.C. 2151.353(A)(4), we must look to R.C. 2151.414.

### ii. R.C. 2151.414(B) and (E)

**{¶34}** Under R.C. 2151.414(B), after a hearing on a permanent-custody, motion, the juvenile court may grant an agency permanent custody of a child if it determines, by clear and convincing evidence, that (1) any of the five enumerated factors under R.C. 2151.414(B)(1)(a)-(e) apply ("prong one"); and (2) permanent custody is in the child's best interest under R.C. 2151.414(D)(1) ("prong two"). *In re Z.C.*, 2023-Ohio-4703, at ¶ 7; R.C. 2151.414(B) and (D). Clear and convincing evidence is the degree of proof that firmly convinces factfinders to believe the facts the proponent attempted to establish. *In re Z.C.* at ¶ 7.

**{¶35}** Relevant here, if a juvenile court determines that R.C. 2151.414(B)(1)(a) applies—the children should not be placed with either parent or cannot be placed with either parent within a reasonable time—prong one is satisfied.[1] But whether that subsection applies requires the juvenile court to look to R.C. 2151.414(E).

**{¶36}** Under R.C. 2151.414(E), when a juvenile court holds a permanent-custody hearing, considers all relevant evidence, and determines by clear and convincing evidence that any factor listed in R.C. 2151.414(E)(1)-(15) exists as to both parents, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." Relevant here, those factors are R.C. 2151.414(E)(1), (4), (10), and (16).

**{¶37}** R.C. 2151.414 (E)(1) asks if, after the agency removed a child from the parent's home and notwithstanding the agency's reasonable case planning and efforts

---

[1] Though the magistrate also found that Y.H. had been abandoned under R.C. 2151.414(B)(1)(b), we need not consider that factor because R.C. 2151.414(B)(1)(a) is dispositive.

to help the parents remedy problems that initially caused the out-of-home placement, the parents "continuously and repeatedly" fail to remedy those problems. To determine whether the parents remedied the problems, the court must consider whether the parents engaged in services and resources that the agency made available. *Id.*

**{¶38}** R.C. 2151.414(E)(4) looks to whether the parents demonstrably lacked commitment by "failing to regularly support, visit, or communicate with the child." R.C. 2151.414(E)(10) asks if the parents abandoned the child. And R.C. 2151.414(E)(16) looks to any other relevant factor.

### C. *Clear and convincing evidence supported the juvenile court's judgment involving prong one*

#### i. <u>Father failed to properly object</u>

**{¶39}** Regarding prong one of the permanent-custody framework—whether a R.C. 2151.414(B)(1)(a)-(e) factor applied—the juvenile court determined that the children could not be placed with either parent in a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(1)(a).

**{¶40}** Father's objections correctly cited the statutory provisions and noted that both prongs must be supported by clear and convincing evidence. But Father's entire challenge to the magistrate's prong-one findings stated, "For the first prong of the analysis, pursuant to Magistrate's Decision, neither Y.H. nor S.H. were in the custody of HCJFS for 12 or more months out of a consecutive 22-month period at the time in which the original motion to Modify TC to PC was filed." Father did not challenge the magistrate's finding that the children cannot be placed in a reasonable time, or should not be placed, with either parent.

**{¶41}** Parties must state their objections with specificity. Juv.R.

40(D)(3)(b)(ii); *accord* Civ.R. 53(D)(3)(b)(ii). Where a party fails to object to a magistrate's decision, the party forfeits the right on appeal to assign as error the trial court's adoption of the magistrate's decision. *In re P.E.*, 2023-Ohio-2438, ¶ 10 (12th Dist.), citing *In re Stephens*, 2001 Ohio App. LEXIS 4451, *3 (12th Dist. Oct. 1 2001). The result of a party's failure to object to a magistrate's decision confines the appellate court to a plain-error review. *See* Juv.R. 40(D)(3)(b)(iv); *see also In re P.E.* at ¶ 10.

**{¶42}** Parental-termination proceedings are civil in nature. *In re S.S.*, 2023-Ohio-245, ¶ 28 (9th Dist.). The plain-error doctrine is disfavored in the civil context and we may find plain error "only in the extremely rare case involving exceptional circumstances" where the error "seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122-123 (1997).

**{¶43}** On appeal, Father does not provide a plain-error argument. When an appellant fails to argue that plain error occurred, an appellate court may choose to disregard the challenge or consider whether plain error exists. *See In re G.W.*, 2024-Ohio-1551, ¶ 24 (1st Dist.); *see also State v. Patton*, 2021-Ohio-295, ¶ 25 (1st Dist.); *In re P.E.* at ¶ 12 ("Nevertheless, because permanent custody decisions are tantamount to the death penalty in a criminal case, this court will consider whether the juvenile court's decision granting permanent custody of P.E. to CCDJFS constitutes plain error.").

**{¶44}** Because parental rights are a long-standing, fundamental interest, we review the trial court's prong-one findings for plain error.

### ii. **The trial court did not plainly err**

**{¶45}** The trial court determined that after Y.H. was removed from the home, Father failed to remedy the problems that caused her to be removed. Father argues

that the evidence failed to establish that there was any "cause of removal that Father needed to remedy, much less that he failed to do so."

**{¶46}** HCJFS became involved with Y.H. and S.H. because both children tested positive for controlled substances at birth. The evidence showed that Mother had a history of addiction and failed to attend any drug screens or participate in any case-plan services.

**{¶47}** Father's case plan required him to complete a DAF, participate in visitation, submit to random drug screenings, obtain stable housing and income, and remain engaged with HCJFS. Father completed the DAF, which did not yield any treatment recommendations. But Father failed to complete a single drug screen. The trial court discussed Father's possible substance abuse due to his criminal history related to substance use, ongoing connection to Mother, failure to complete drug screens, and his then-pending indictment for drug possession and trafficking.

**{¶48}** The court cited Father's minimizing or denial of Mother's drug addiction. It cited an FNC visit supervisor's testimony that Mother arrived at a visit with the children when it appeared she was impaired by drugs. Father denied that Mother's physical state—being disoriented, swaying in a chair while holding the baby, and not being able to keep her eyes open—was caused by drug use. The juvenile court stated that Father "appeared to believe that Mother does not have a substance abuse problem" despite the evidence that Y.H. and S.H. tested positive for drugs at birth.

**{¶49}** This constitutes clear and convincing evidence that Father failed to remedy the problems that led to the children's removal from the home—substance abuse. Indeed, Father even refused to acknowledge that there was a problem. He failed to attend a single drug screen as required by the case plan. While Mother's drug addiction may have initially driven the children's removal, Father's criminal history

provides a reasonable basis to require him to complete drug screens. And he was indicted on drug-trafficking and possession charges during the pendency of the case.

{¶50} Considering Mother's undisputed substance-abuse issues and Father's denial or minimization of her substance abuse, along with his criminal history involving drugs and failure to complete drug screens, there was a reasonable probability that Y.H. and S.H. would continue to be exposed to drugs were they placed with Father. The trial court's finding that Father had failed to remedy the issues that led to the children's removal is supported by clear and convincing evidence. We find no plain error.

{¶51} R.C. 2141.414(E) requires the juvenile court to enter a finding that a child cannot or should not be placed with either parent—thus satisfying prong one of the permanent-custody framework—if it finds even one of the R.C. 2151.414(E) factors apply. HCJFS established by clear and convincing evidence that R.C. 2151.414(E)(1) applied. Although we discuss R.C. 2151.414(E)(10)—abandonment—in the best-interest analysis, we decline to address the remainder of the R.C. 2151.414(E) factors.

{¶52} The juvenile court's findings on prong one were supported by sufficient evidence and were not contrary to the weight of the evidence. We hold that the juvenile court correctly found that the children should not, or cannot within a reasonable time, be placed with either parent. We turn to prong two of the statutory framework.

### D. Prong Two: Best interest

{¶53} After determining that prong one of R.C. 2151.414(B)(1) was satisfied, the juvenile court had to determine whether permanent custody to HCJFS was in the children's best interest. *See* R.C. 2151.414(B)(1); *see also* R.C. 2141.353(E). When considering whether permanent custody to an agency is in the children's best interest, juvenile courts must consider "all relevant factors," including, but not limited to, those

listed under R.C. 2151.414(D). "A child's best interest is a ""fluid concept, as it involves the child's continually-changing need for appropriate care.""" *In re K.D.*, 2024-Ohio-5582, ¶ 50 (1st Dist.), quoting *In re D.V.*, 2022-Ohio-1024, ¶ 12 (1st Dist.), quoting *In re D.M.*, 2020-Ohio-3273, ¶ 47 (1st Dist.), quoting *In re G.L.S.*, 2018-Ohio-1606, ¶ 16 (9th Dist.). In weighing the best-interest factors, no one factor is given more weight. *In re N*, 2024-Ohio-1492, ¶ 17 (1st Dist.).

### i. R.C. 2151.414(D)(1)(a): Interactions and interrelationships

**{¶54}** R.C. 2151.414(D)(1)(a) requires juvenile courts to examine the children's "interaction[s] and interrelationship[s] . . . with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child."

**{¶55}** The juvenile court determined that Father was bonded with his children, visits between Father and the children went well, and "he engages in age-appropriate activities and provides appropriate care for them." Father's visits remained facilitated and did not progress beyond the most restrictive level.

**{¶56}** The juvenile court noted Father did not visit with Y.H. or S.H. until December 2023 and Father "acknowledged that it took multiple visits for Y.H. to become comfortable with him." But when paternity was established, Father consistently visited the children. Though it is unclear exactly when paternity was established, it appears to be at some point after June 14, 2023, when HCJFS filed its motion for permanent custody. When there is a question about paternity, unless the alleged parent delays establishing paternity, the juvenile court should not hold lack of visitation against the alleged parent for the time before paternity is established.

**{¶57}** The juvenile court additionally found that Y.H. and S.H. lived together in a foster home and shared a bond with their foster family, with whom they had lived

since shortly after their births. The foster family indicated they would adopt the children if permanent custody were granted to HCJFS.

### ii. R.C. 2151.414(D)(1)(b): The children's wishes

**{¶58}** This factor requires juvenile courts to consider the children's wishes involving custody, unless the children are too young to express their wishes. The children's wishes may also be expressed through their guardian ad litem. *See* R.C. 2151.414(D)(1)(b).

**{¶59}** Here, the children were too young to directly express their wishes, but below, their guardian ad litem recommended permanent custody. On appeal, the guardian ad litem advocated in favor of affirming the juvenile court's judgment.

### iii. R.C. 2151.414(D)(1)(c): The children's custodial history

**{¶60}** The juvenile court must consider the children's custodial history, including whether, relevant here, the child had been in the agency's temporary custody for 12 or more months of a consecutive 22-month period. R.C. 2151.414(D)(1)(c).

**{¶61}** Both children were placed in HCJFS's temporary custody just days after they were born and remained in the agency's custody throughout the pendency of the case. At the time the magistrate entered her decision, Y.H. had been in HCJFS's custody for 12 or more months; S.H. had not. Both children had been in substitute care for more than 97 percent of their lives and the only home they had ever known was their foster home.

**{¶62}** Father argues that the time children spend in substitute care should not weigh against a parent "when they are using the time, as father here, to complete case plan goals." While his argument makes some sense, it does not help him. Father failed to meaningfully engage in services, as he did not submit to a single drug screen. Moreover, he continued to deny or minimize Mother's substance-abuse problems and

failed to show that he would protect the children from any danger posed by her addiction and drug use. While Father consistently visited the children and appeared to be working toward establishing stable employment and housing, he failed to complete any drug screens or demonstrate that he would keep the children away from Mother if she continued to abuse drugs.

### iv. R.C. 2151.414 (D)(1)(d): Need for a legally secure placement

{¶63} R.C. 2151.414(D)(1)(d) looks at a "child's need for a legally secure permanent placement and whether that type of placement can be achieved without" granting the agency permanent custody of the children. This court has stated, "a legally secure permanent placement 'is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs.'" *In re P. & H.*, 2019-Ohio-3637, at ¶ 42 (1st Dist.), quoting *In re K.W.*, 2018-Ohio-1933, ¶ 87 (4th Dist.).

{¶64} The juvenile court determined that Father could not provide a legally secure placement because he had not "meaningfully engaged in case plan services or otherwise demonstrated behavioral changes that would be necessary to ensure the safety and well-being of the children." It further noted that Father's "insight into Mother's substance abuse remains minimal," and that Father lacked employment, had only recently obtained housing, and was awaiting trial on felony drug charges.

{¶65} Father challenges the juvenile court's reliance on his lack of case-plan compliance. He notes that the children were removed from the home because of Mother's behavior, rather than the result of his own actions. He argues that his DAF did not recommend drug screenings and HCJFS employees acknowledged that no one had observed or reported Father using substances or being under the influence of substances.

**{¶66}** Father also argues that the only evidence supporting the juvenile court's finding that he lacked insight into Mother's substance abuse was testimony about the February 2024 incident at FNC. We note that Father's own testimony passed off her behavior as her being a "night owl," and he had no concern about "the way that she was acting." He did not believe that she was "inebriated" because he did not believe she would visit her children in that condition. Additionally, Brown, an HCJFS caseworker, testified that when she spoke with Father about Mother's substance abuse, he "didn't seem like Mother had a problem." After Father attended the hearing in which the juvenile court adjudicated S.H. abused, neglected, and dependent based on him testing positive for drugs at birth and spending two weeks in the NICU, Brown spoke with Father about S.H.'s positive drug screen. Brown testified that Father expressed no concern or understanding about Mother's substance abuse. So, despite unequivocal evidence that Mother was abusing substances during her pregnancy with both children, and strong evidence that Mother used drugs during the FNC supervised visit in February 2024, Father continued to lack any insight into her substance-abuse issues.

**{¶67}** Father did not meaningfully comply with the case plan, as he failed to submit to drug screenings. He denied or minimized Mother's substance-abuse issues. And Father was indicted on multiple felony-drug charges, including aggravated trafficking, trafficking, and possession of illegal drugs, during the pendency of this case. Clear and convincing evidence supports the juvenile court's determination the children need a legally secure permanent placement and that the only way to achieve that placement was by awarding HCJFS permanent custody of the children.

### v. <u>R.C. 2151.414(D)(1)(e): Other factors—abandonment</u>

**{¶68}** Juvenile courts must determine whether any factor contained in R.C.

2151.414(E)(7) to (11) applies. Relevant here, R.C. 2151.414(E)(10) asks if the parents had abandoned the child. Under R.C. 2151.011(C), if a parent fails to visit or maintain contact with a child for more than 90 days, regardless of whether the parent later made contact, a rebuttable presumption arises that the parent has abandoned the child.

**{¶69}** This court has explained that the presumption of abandonment is not rebutted "'by the mere fact that a father had not established paternity during the period when he did not visit the child.'" *In re C.R.*, 2022-Ohio-3540, ¶ 21 (1st Dist.), quoting *In re K.T.1*, 2018-Ohio-4312, ¶ 79 (1st Dist.). But while the "legal status of the parent is not always determinative" when analyzing abandonment, "the conduct and belief or knowledge of the parent in relation to the child may also be considered when determining whether a parent has abandoned his or her child." *Id.* Accordingly, in *In re C.R.*, we held that the juvenile court erred in finding that a father abandoned a child where the father had not acknowledged the child, had not held himself out as the child's father before paternity was established, credibly believed that he could not have children, and filed for custody the same month that paternity was established. *Id.* at ¶ 21.

**{¶70}** The magistrate determined that Father abandoned Y.H. That finding appears to include the period before paternity was established, between her birth in July 2022 and, at the latest, June 26, 2023, when Father filed a petition for custody of Y.H. accompanied by a document showing that paternity had been established.

**{¶71}** Father did not visit Y.H. between her birth and when he established paternity, more than the 90-day period that creates a rebuttable presumption of abandonment under R.C. 2151.011(C). Although Father sought custody of Y.H. soon after paternity was established, he offered no additional evidence to rebut the presumption that he had abandoned Y.H.

**{¶72}** Assuming without deciding that Father's seeking custody of Y.H. soon after establishing paternity was enough to rebut the prepaternity-abandonment presumption, his failure to visit or maintain contact with Y.H. for more than four months between the date he established paternity—on or before June 26, 2023—and when he began visitation with Y.H. in November or December 2023 created a rebuttable presumption that he had abandoned Y.H. Father offered no testimony that he asked HCJFS to set up visitation or that HCJFS delayed initiating visits. Thus, Father failed to rebut the presumption that he abandoned Y.H.

*Clear and convincing evidence supports the juvenile court's best-interest findings*

**{¶73}** Father clearly loves his children and has developed a bond with them. But we hold that clear and convincing evidence supports the juvenile court's determination that it is in the children's best interest to grant HCJFS permanent custody. The primary issue in this case is substance abuse. The children were removed from the home because they both tested positive for drugs when they were born. That constitutes irrefutable evidence that Mother used drugs during her pregnancies and that her drug use harmed the children.

**{¶74}** Yet, according to Brown's testimony, Father expressed no concern about Mother's drug use in general, or its potential for exposing the children to danger. Indeed, despite strong evidence that Mother was impaired during a February 2024 FNC visit, Father refused to believe that Mother was impaired, instead chalking her behavior up to her being a "night owl." This demonstrates Father's lack of protective capability. And despite HCJFS requiring drug screens, Father never submitted to a single screen. The juvenile court's best-interest determination is neither contrary to the weight of the evidence nor supported by insufficient evidence.

**{¶75}** Because clear and convincing evidence supports the juvenile court's

judgment granting permanent custody of Y.H. and S.H. to HCJFS, we affirm the juvenile court's judgment and overrule Father's assignment of error.

### III. Conclusion

**{¶76}** For the foregoing reasons, we overrule Father's assignment of error and affirm the juvenile court's judgment.

Judgment affirmed.

**KINSLEY, P.J.,** and **ZAYAS, J.,** concur.