[Cite as *In re A.J.*, 2025-Ohio-5616.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: A.J.                          :          APPEAL NO.     C-250544
                                                TRIAL NO.      F/11/1268 X
                                     :

                                     :
                                                *JUDGMENT ENTRY*
                                     :

 

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 12/17/2025 per order of the court.**

**By:**_____
      **Administrative Judge**

**[Cite as *In re A.J.*, 2025-Ohio-5616.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: A.J. | : | APPEAL NO. | C-250544 |
| | | TRIAL NO. | F/11/1268 X |
| | : | | |
| | : | *O P I N I O N* | |
| | : | | |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 17, 2025

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Megan E. Busam*, Assistant Public Defender, for Appellee Guardian ad Litem,

*Jon R. Sinclair,* for Appellant Mother.

**NESTOR, Judge.**

{¶1} Appellant Mother challenges the juvenile court's judgment terminating her parental rights and granting the Hamilton County Department of Job and Family Services ("HCJFS") permanent custody of her daughter A.J. After reviewing the record, we cannot say that the juvenile court's judgment was against the manifest weight of the evidence. Accordingly, we overrule Mother's assignment of error and affirm the judgment of the juvenile court.

## I. Factual and Procedural History

{¶2} A.J. was born in March 2018. Two months later, in May 2018, the juvenile court removed A.J. from Mother's care and placed her in the temporary custody of HCJFS due to Mother's substance abuse and overdose. A.J. remained in the temporary custody of HCJFS for a year. In May 2019, Mother regained custody of A.J.

{¶3} The current case was initiated in March 2023, when police responded to the home after A.J.'s older brother overdosed. HCJFS again obtained emergency custody of A.J. due to concerns about Mother's substance abuse and the condition of the home.

{¶4} HCJFS filed a case plan for reunification in April 2023. In the case plan, HCJFS indicated that Mother must obtain sobriety, safe housing, and stable employment.

{¶5} The magistrate adjudicated A.J. as abused, neglected, and dependent in May 2024. The court conducted a dispositional trial between June 2024 and April 2025. The court heard evidence about Mother's substance-use issues, housing, employment, and A.J.'s relationships.

{¶6} Caseworkers testified about supervised visits with A.J. where Mother

appeared to be under the influence. On multiple occasions, caseworkers observed Mother falling asleep, slumping over, and slurring her words. Due to Mother's behavior, caseworkers had to end the visits early.

{¶7} Throughout the proceedings, Mother has tested positive on multiple toxicology screenings for various substances including cocaine, methamphetamines, fentanyl, and benzodiazepines. Mother has also failed to show up for some drug tests. HCJFS considers no-shows equivalent to positive results. Mother disputes the validity of the positive tests but provides no substantial evidence to show that the tests were indeed false positives.

{¶8} Mother has engaged in some treatment through Crossroads but has resisted support group treatment such as Narcotics Anonymous. Mother revoked her release of information from Crosswords, so HCJFS could not verify the extent of her treatment. In April 2025, Mother testified that she ended her treatment at Crossroads and had begun receiving treatment at MedMark. However, Mother did not provide any evidence of engagement at MedMark, and HCJFS was unable to confirm her participation.

{¶9} The court also heard evidence about Mother's housing situation. Throughout the proceedings, Mother had not been forthcoming with HCJFS about her housing situation. Caseworker Miranda Shelton testified in October 2024 that Mother had a pending eviction, which was her second eviction that year. Mother had represented that she was the leaseholder on that apartment, when the apartment was in a relative's name.

{¶10} In spring 2025, Shelton made three unsuccessful attempts to visit Mother's new apartment. Mother has not shared the entirety of her new lease with Shelton, or anyone else. Shelton testified that she remains concerned that Mother will

be unable to maintain stable housing.

{¶11} Mother's ability to provide for A.J. was also in question. Mother's income stems from working as a delivery driver and at Taco Bell. Mother did not provide any pay stubs for either employment. She did provide a letter from her manager at Taco Bell, confirming her employment. However, Mother's testimony indicated that she might not be able to continue working at Taco Bell, citing transportation concerns. Mother also stated that she was in the process of applying for disability.

{¶12} Finally, the court heard testimony about A.J.'s relationships. Multiple caseworkers testified that Mother and A.J. have a positive relationship. Mother and A.J. are happy to see each other at visits. Mother is prepared for the visits, and engages in age-appropriate activities with A.J. A.J. seems to enjoy visits with Mother.

{¶13} Testimony also showed that A.J. is bonded to her foster family. She hugs her foster parents and is comfortable asking for things she needs. The foster family has indicated a willingness to adopt A.J.

{¶14} A.J.'s father is not involved in her life. He has not visited A.J. since she has been in foster care. Over the course of these proceedings, HCJFS has attempted to contact A.J.'s father, to no avail.

{¶15} Overall, the evidence showed that although Mother had made some progress towards the goals in the case plan, that progress was insufficient to remand A.J. to Mother's care. Accordingly, the magistrate granted permanent custody of A.J. to HCJFS in April 2025.

{¶16} Mother and A.J. objected to the magistrate's decision in May 2025. However, in August 2025, A.J.'s conflict counsel filed a motion to withdraw, as A.J.'s wishes had become consistent with those of her guardian ad litem ("GAL"). The GAL

supported a grant of permanent custody to HCJFS.

{¶17} After reviewing the objections, the proceedings, and the evidence, the juvenile court found that the magistrate did not appropriately determine the factual issues or apply the law. Nonetheless, the juvenile court committed A.J. to the permanent custody of HCJFS in September 2025.

## II. Analysis

{¶18} Mother contests this decision on appeal. Specifically, in a single assignment of error, she asserts that the juvenile court's judgment was against the manifest weight of the evidence.

{¶19} In reviewing a juvenile court's judgment terminating parental rights under R.C. 2151.414, this court applies a sufficiency of the evidence and/or a manifest weight of the evidence standard of review, depending upon the nature of the arguments raised. *In re Z.C.*, 2023-Ohio-4703, ¶ 11. "Sufficiency of the evidence and manifest weight of the evidence are distinct concepts[.]" *Id.* at ¶ 13.

{¶20} Here, Mother raises a manifest weight challenge. Therefore, we must "weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the [juvenile] court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re A.B.*, 2015-Ohio-3247, ¶ 16 (1st Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12.

{¶21} HCJFS may obtain permanent custody of a child in one of two ways. *In re P/W Children*, 2020-Ohio-3513, ¶ 28 (1st Dist.), citing *In re R.B.*, 2019-Ohio-3469 ¶ 10 (1st Dist.). The agency can either "first obtain temporary custody of the child and then file a motion for permanent custody under R.C. 2151.413, or [] the agency may request permanent custody as part of its original abuse, neglect, or dependency

complaint under R.C. 2151.27(C)." *Id.*

{¶22} HCJFS sought permanent custody of A.J. as part of its original abuse, neglect, or dependency complaint. Thus, "the juvenile court must determine (1) that the child cannot be placed with either parent within a reasonable time or should not be placed with the parent, using the factors set forth in R.C. 2151.414(E), and (2) that permanent custody is in the best interest of the child based on the factors set forth in R.C. 2151.414(D)(1)." *Id.* at ¶ 29.

### A. R.C. 2151.414(E)

{¶23} R.C. 2151.414(E) provides a list of 16 factors for courts to consider when determining "whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents[.]" R.C. 2151.414(E). "The juvenile court may rest its determination that a child cannot or should not be placed with either parent on a finding that a single R.C. 2151.414(E) factor exists." *In re J.B.*, 2025-Ohio-2135, ¶ 39 (1st Dist.), citing *In re Z.F.*, 2024-Ohio-1698, ¶ 41 (1st Dist.).

{¶24} The juvenile court relied on R.C. 2151(E)(1), (2), (4), and (10) to determine that A.J. cannot and should not be returned to either parent.

*1. Remedying the conditions that caused A.J.'s removal*

{¶25} R.C. 2151.414(E)(1) looks to whether "the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." R.C. 2151.414(E)(1). The statute directs courts to "consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents[.]" *Id.*

{¶26} In its case plan, HCJFS identified concerns of substance abuse, violent behavior, and dangerous conditions of the home. To remedy these concerns, HCJFS

7

expected Mother to obtain sobriety, shown through consistent negative drug tests, as well as safe housing, and stable income.

{¶27} The juvenile court found that "Mother made some progress towards the completion of her case plan services, but that this progress [was] insufficient to determine that she substantially remedied the conditions that initially caused A.J. to be removed from the home."

{¶28} We agree. While concerns linger regarding Mother's ability to maintain safe housing and a stable income, what is most concerning is Mother's continued substance-use issues. Throughout the pendency of these proceedings, Mother has tested positive for various substances on multiple toxicology screens. Multiple caseworkers testified that Mother appeared to be under the influence during supervised visits with A.J.

{¶29} To the extent that Mother has engaged in treatment for her addiction, it is not enough to alleviate concerns about her lack of sobriety. Mother completed some treatment at Crossroads but was resistant to participating in support groups such as Narcotics Anonymous. Towards the end of the proceedings, Mother testified that she was no longer involved with Crossroads and was receiving treatment from MedMark instead. But Mother provided no documentation evidencing her engagement with MedMark.

{¶30} Because Mother tested positive on toxicology screens, appeared to be under the influence during supervised visitation with A.J., and failed to provide evidence to suggest meaningful engagement with treatment, the juvenile court properly found that she had failed to remedy the conditions that caused A.J.'s removal.

*2. Chemical Dependency*

{¶31} Next, R.C. 2151.414(E)(2) directs courts to consider whether a parent

has a "chemical dependency . . . that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing[.]"

{¶32} As discussed, Mother's battle with sobriety hinders her from providing an adequate home for A.J. Given that she has struggled with sobriety throughout these proceedings and since A.J. was born, there is no evidence to suggest that she will be able to remedy these concerns within a year. Thus, the juvenile court properly found that Mother's substance-use issues hinder her ability to provide an adequate home for A.J.

### 3. Lack of Commitment

{¶33} The fourth factor looks to whether "[t]he parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child[.]" R.C. 2151,414(E)(4).

{¶34} This factor is met as to A.J.'s father. Father has never engaged in supervised visitation with A.J., nor communicated with HCJFS.

{¶35} Mother, in contrast, has displayed a commitment to A.J. She participates in weekly visits and is rarely late or absent. Testimony indicates that she is prepared for the visits by bringing toys and clothes for A.J., and engages in age-appropriate activities with A.J.

{¶36} But Mother's commitment to A.J. does not negate concerns about her lack of sobriety. *See In re J.B.*, 2025-Ohio-2135, at ¶ 39 (1st Dist.) ("The juvenile court may rest its determination that a child cannot or should not be placed with either parent on a finding that a single R.C. 2151.414(E) factor exists.").

{¶37} Ultimately, despite Mother's demonstrated commitment to A.J., substantial concerns remain regarding her lack of sobriety. Thus, the juvenile court's

finding that A.J. cannot or should not be placed with either parent under R.C. 2151.414(E) was supported by the weight of the evidence.

### B. R.C. 2151.414(D)

**{¶38}** After finding that a child cannot or should not be placed with either parent, the court must then determine that a grant of permanent custody to HCJFS is in the child's best interest. *In re R.B.*, 2019-Ohio-3469, at ¶ 11 (1st Dist.). In determining the best interest of the child, the juvenile court must consider "all relevant factors," including,

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child . . . ;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a)-(e).

**{¶39}** Courts should consider the factors equally and not give any one factor more weight than another. *In re S.H. and Y.H.*, 2025-Ohio-2338, ¶ 53 (1st Dist.), citing *In re N*, 2024-Ohio-1492, ¶ 17 (1st Dist.).

#### 1. Child's Relationships

**{¶40}** First, the court must consider the child's relationships with others. R.C.

2151.414(D)(1)(a).

**{¶41}** Testimony indicates that Mother and A.J. are happy to see each other at visits and enjoy spending time together. This suggests that they are well-bonded and share a positive relationship.

**{¶42}** A.J. also has a positive relationship with her foster family. A.J.'s GAL testified that A.J. is bonded to her foster family, and that the foster family has expressed an interest in adopting her.

### 2. *Child's Wishes*

**{¶43}** Courts must then consider the wishes of the child, with due regard for the child's maturity. R.C. 2151.414(D)(1)(b).

**{¶44}** A.J.'s GAL testified that A.J. is too young to fully understand the nature of terminating parental rights. A.J.'s wishes have not been consistent throughout the proceedings. The court assigned A.J. a conflict attorney, because she expressed an interest in returning to Mother. These wishes conflicted with those of her GAL.

**{¶45}** However, in August 2025, the conflict attorney filed a motion to withdraw, as A.J. no longer wished to live with Mother. The motion stated that A.J.'s wishes had become consistent with those of her GAL, who supports a grant of permanent custody to HCJFS.

### 3. *Child's Custodial History*

**{¶46}** The third factor directs courts to consider the child's custodial history, "including whether the child has been in the temporary custody [of a public services agency or a private child placing agency] . . . for twelve or more months of a consecutive twenty-two month period[.]" R.C. 2151.414(D)(1)(c).

**{¶47}** This action is the second time in A.J.'s life that she has been in HCJFS custody. During the current proceedings, A.J. has been in HCJFS custody since March

2023. Thus, she has been in HCJFS custody for more than 12 months of a consecutive 22-month period.

### 4. *Child's Need for a Secure Permanent Placement*

**{¶48}** R.C. 2151.414(D)(1)(d) looks at the "child's need for a legally secure permanent placement and whether that placement can be achieved without a grant of permanent custody to the agency." "[A] legally secure placement, 'encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs.'" *In re A.S.*, 2025-Ohio-1724, ¶ 27 (1st Dist.), quoting *In re E.H.*, 2022-Ohio-4701, ¶ 24 (1st Dist.), citing *In re P. & H.,* 2019-Ohio-3637, ¶ 42 (1st Dist.).

**{¶49}** In finding that a secure placement for A.J. could not be achieved without granting permanent custody to HCJFS, the juvenile court stated, "[I]f [A.J.] were to be returned to Mother's custody, the Court would be greatly concerned about the risk of harm to the child, including the potential that she would be exposed to substances or be at risk of future removals from the home, which is traumatic in and of itself." Given A.J.'s custodial history and Mother's continued struggles with sobriety, the weight of the evidence supports this finding.

### 5. *Other Factors*

**{¶50}** Finally, the court must consider whether any factors in R.C. 2151.414(E)(7) to (11) apply in determining the child's best interest. R.C. 2151.414(D)(1)(e).

**{¶51}** The juvenile court found that R.C. 2151.414(E)(10) was applicable to Father. R.C. 2151.414(E)(10) looks to whether the parent has abandoned the child. A child is presumed to be abandoned by a parent if the parent fails to visit or maintain contact with the child for more than 90 days. *In re Y.F.*, 2024-Ohio-5604, ¶ 32 (8th

12

Dist.), citing R.C. 2151.011(C). Father has not visited or contacted A.J. in over 90 days. Thus, there is a presumption that Father abandoned A.J.

### III. Conclusion

**{¶52}** The juvenile court properly determined that A.J. should not be placed with Mother, and that an award of permanent custody to HCJFS is in A.J.'s best interest. We recognize that "terminating a parent's right to raise his or her own [child] is the family-law equivalent of the death penalty[.]" *In re P. & H.*, 2019-Ohio-3637, at ¶ 10 (1st Dist.). However, nothing in the record suggests that the juvenile court lost its way and created a manifest miscarriage of justice. Thus, the grant of permanent custody to HCJFS was not against the manifest weight of the evidence.

**{¶53}** We overrule Mother's assignment of error and affirm the judgment of the juvenile court.

Judgment affirmed.

**BOCK, P.J.,** and **MOORE, J.,** concur.