[Cite as *In re E.J.*, 2025-Ohio-5404.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: E.J.

:

APPEAL NO. C-250454
TRIAL NO. F/20/455 Z

:

:     *JUDGMENT ENTRY*

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**
**Enter upon the journal of the court on 12/3/2025 per order of the court.**

**By:**_____
        **Administrative Judge**

[Cite as *In re E.J.*, 2025-Ohio-5404.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: E.J. | : | APPEAL NO. | C-250454 |
| | | TRIAL NO. | F/20/455 Z |
| | : | | |
| | : | *O P I N I O N* | |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 3, 2025

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Megan E. Busam*, Assistant Public Defender, for Appellee Guardian ad Litem,

*Christopher P. Kapsal* for Appellant Mother.

**Bock, Judge.**

**{¶1}** This parental-termination case returns to us after our remand in *In re E.J.*, 2024-Ohio-2421 (1st Dist.). Appellant Mother challenges the juvenile court's judgment terminating her parental rights and granting the Hamilton County Department of Job and Family Services ("HCJFS") permanent custody of her son E.J. Mother raises sufficiency and manifest-weight challenges to the juvenile court's determination that granting HCJFS permanent custody of E.J. is in his best interest.

**{¶2}** We acknowledge Mother's significant progress in obtaining and maintaining sobriety. But after reviewing the record, we cannot say that the juvenile court's best-interest findings were not supported by sufficient evidence or that its decision was against the weight of the evidence.

**{¶3}** E.J., who has lived with the same foster parents for more than five years and is bonded with them, reported that he wants to be adopted by his foster family. His foster family wishes to adopt him as well. A recent psychological evaluation of E.J. indicated that Mother's prior neglect has caused, and continues to cause, psychological harm to E.J. Further, Mother's inconsistent presence in his life has caused E.J. anxiety and stress. Finally, a significant period of time during the pendency of the case elapsed without Mother contacting or visiting E.J.

**{¶4}** We overrule Mother's assignment of error and affirm the trial court's judgment.

### I. Factual and Procedural History

#### A. Procedural history

**{¶5}** In April 2020, the juvenile court granted HCJFS emergency custody of Mother's son, E.J. The juvenile court adjudicated E.J. dependent in August 2020. HCJFS moved for permanent custody in March 2022.

{¶6} The magistrate granted HCJFS's permanent-custody motion in September 2023. Mother objected. The juvenile court overruled Mother's objections, adopted the magistrate's decision, and granted HCJFS permanent custody of E.J.

{¶7} Mother appealed. This court sustained Mother's first and second assignments of error, holding that the juvenile court failed to independently review the magistrate's decision and improperly adopted the magistrate's decision when the magistrate shifted the burden of proof to Mother. *In re E.J.*, 2024-Ohio-2421, at ¶ 25-26, 33 (1st Dist.). We remanded the cause for the juvenile court to properly review the magistrate's decision in light of Mother's objections. *Id.* at ¶ 37.

{¶8} On remand, the juvenile court heard additional evidence, overruled Mother's objection to the magistrate's decision, and granted HCJFS permanent custody of E.J. Mother appeals.

## B. Facts

### 1. Pre-remand evidence

{¶9} In *In re E.J.*, this court recounted the evidence at the previous hearing in detail. *See id.* at ¶ 5-15. We briefly summarize that evidence here.

{¶10} Mother gave birth to E.J. in August 2018. (His father is unknown.) Mother struggled with substance-abuse issues for most of her life, but she stopped using drugs when she was six-weeks pregnant with E.J. In April 2020, after the onset of the COVID-19 pandemic, Mother relapsed and HCJFS moved for emergency custody of E.J.

{¶11} HCJFS placed E.J. with a foster family, where he has lived during the entirety of this case. The foster parents placed E.J. in therapy to address his needs.

{¶12} Mother experienced mental-health issues during the pendency of the case, including two psychiatric hospital admissions in which she showed signs of

paranoia and psychosis. Mother testified that she was receiving mental-health treatment at Mahajan Therapeutics ("Mahajan") and that her Mahajan treatment providers determined that Mother had been misdiagnosed and improperly prescribed a medication that contributed to her mental-health episodes and hospital admissions in 2021 and 2022.

**{¶13}** Mother went "missing for eight months" from May 2022 through February 2023. She did not visit or contact E.J. during this period. In February 2023, Mother resumed supervised visitation and Mother's caseworker testified that the visits went well.

**{¶14}** Mother testified that she had engaged in several drug-treatment programs and was presently receiving treatment at Cardinal Treatment Facility ("Cardinal") in Ironton, Ohio, beginning in August 2022. Mother had successfully completed an in-patient program and was in Cardinal's "transitional" program, where she lived in independent housing. She participated in alcohol and drug ("AOD") counseling. Mother's AOD counselor testified that Mother was her most successful client. Mother had passed multiple drug screens. And Mother obtained employment at a local restaurant through Cardinal, where she worked 40-50 hours a week.

### 2. *Post-remand testimony*

**{¶15}** On remand, the juvenile court heard additional testimony from Mother, her caseworker at Cardinal, E.J.'s therapist, Foster Mother, and E.J.'s guardian ad litem ("GAL").

#### a. Mother testified about her health, life, and more

#### Mother's treatment and health

**{¶16}** Mother testified that she has "a disease, and it's called addiction. It would take an in-depth relapse prevention of what steps could be [taken] if I were to

mess this up." She had been clean for "close to three years." Mother acknowledged that she had been in several recovery programs before Cardinal, but she believed this time was different because "I lost my youth. That's one thing . . . I didn't know for the first few years how emotionally numb I was . . . I re-parented myself every day." Mother had attended individual counseling once a week while in independent living and attended group meetings three times a week.

**{¶17}** Regarding her mental health, Mother believed that it was currently the "[b]est its ever been." She had become deeply involved in physical fitness and had lost a significant amount of weight. Mother believed that diet and exercise sufficiently addressed her mental-health needs. Mother regularly went to a gym where she had "made healthy connections . . . I only see these people at the gym."

**{¶18}** Mother had stopped attending therapy, but she resumed it after this court's remand because she "wanted to be able to prove my competency in case you guys played the mental health card." At the time of the hearing, Mother was attending therapy once a month and paid out of pocket for the sessions.

<u>Mother's relationship with E.J.</u>

**{¶19}** Mother agreed that if she received custody of E.J., "transitioning him into that would be hard, but I'd be willing to do it." Mother knew E.J. loved his foster family and that they had "done right by him . . . He's a wonderful child, and they've helped with that."

**{¶20}** Mother acknowledged that she had several extended periods where she did not see E.J., stating that she "did it in his best interest. When my mental health collapsed at the end of 2021 when I was misdiagnosed, it was in his best interest that I do so, and [Mother's caseworker] knew where I was at every stage of the way."

**{¶21}** At the time of the hearing, Mother had not seen E.J. since April 2024,

6

shortly after the juvenile court initially overruled her objections to the magistrate's decision. Mother was confused about whether she was able to resume visitation following this court's remand, but she testified that if she had the opportunity to visit E.J., she would do it "[r]ight now."

{¶22} Mother testified that E.J. received mental-health treatment and had a PTSD diagnosis, which she believed originated from his removal from her care. Mother agreed that she had not participated in E.J.'s mental-health treatment. She stated that she would place E.J. in mental-health treatment through Mahajan if she obtained custody of him. Mother was unaware that E.J. had been diagnosed with ADHD or was recently placed on a 504 plan at school. Mother had never participated in E.J.'s school meetings.

{¶23} Mother believed it was in E.J.'s best interest "long term" to live with her, explaining,

> I'm his mother . . . You tear me out of his life and he'll come up with his
> own ideas, you know, and then whatever experience or life decisions
> that is being made around him and things he's hearing about me will be
> clouded because of other people's judgment and not his own. I'm trying
> to rise above that so he can see that I would never leave him.

{¶24} When pressed on whether she would prefer for E.J. to stay with his foster family and have contact with Mother, she stated, "If it's a relationship with them first and then to [E.J.], I'm willing to do that." She said, "Long term. I want to build a bridge. I'm not going to take him from their lives, you know, I'm just trying to insert myself in his life." When asked if what she wanted was for E.J. to live with his foster family but be permitted contact with her, Mother responded that if it were up to her, "It would be that he stay with them and I'd be in his life." Later, however, Mother

confirmed that she was seeking custody of E.J.

Mother's employment and home

{¶25} In August 2024, Mother moved into a two-story, three-bedroom home, which she was renovating. Mother paid $900 a month in rent. Mother had a female roommate, who would be moving out if Mother was granted custody of E.J. The roommate was in recovery and was "a couple years clean." Mother stated that there was a room in her home for E.J., but she had no furnishings other than a dresser.

{¶26} Mother worked 27-to-35 hours each week at a restaurant and around 40 hours per week as an "RA" at Southern Hope Recovery Center, where she assisted newly-admitted individuals. Mother also attended school at the "Collins Career Center," where she was working to achieve her high school diploma.

{¶27} Should Mother be awarded custody of E.J., she planned to hire a babysitter while she was at work. Moreover, she planned to reduce her hours at the restaurant. Mother hoped to become a drug therapist at Southern Hope after obtaining her high school diploma, which would increase her income.

b. Caseworker described Mother's successful sobriety journey

{¶28} Shelly Lambert, the transitional-living coordinator at Cardinal, testified that she was Mother's case manager at Cardinal when Mother began treatment there in August 2022. Lambert is certified as a "chemical dependency counselor associate" through the State of Ohio. Mother entered transitional housing in November 2022, and Lambert was Mother's counselor and case manager beginning in June 2023. In addition to Mother's five group counseling sessions each week, Mother attended individual counseling sessions and case-management sessions with Lambert each week.

{¶29} Lambert lauded Mother's progress at Cardinal stating, "[S]he's our

8

success story." In transitional housing, Cardinal works to help its patients address mental-health struggles and develop coping skills, "relapse prevention," and emotional-regulation techniques. Lambert stated that Mother "has pretty much accomplished all of them . . . She never failed a drug screen while she has been in services . . . She gained employment . . . She started going to school in transitional." In transitional housing, Mother submitted to drug screens three times per week.

{¶30} When Mother entered independent living in August 2024, she was drug screened weekly. Lambert testified that she continued to see Mother at least once a week and that Mother had continued to attend group sessions at Cardinal despite "not even hav[ing] to be here."

{¶31} Mother completed care at Cardinal in November or December 2024 and no longer received services there. Lambert testified that she did not have concerns about Mother: "I think [Mother] is going to be very successful, and she knows what she wants. We talk about it all the time. She wants to eventually, you know, to help people. She wants to become a counselor. She wants to do case management."

c. E.J.'s therapist described his behavior and needs

{¶32} E.J. had been attending therapy with Caitlyn McCandless for two years. At the time of the hearing, E.J. attended therapy once a month. He had received a psychological evaluation, which resulted in "an ADHD, Predominately Hyperactive-Impulsive Presentation[,] and PTSD diagnoses."

{¶33} E.J.'s therapy goals "surround behavior, emotional support, as well as ADHD symptom management." McCandless testified that E.J. described "anxious behaviors at home, struggles with hyperactivity and inattentiveness at school and at home, struggles with [] impulsive behaviors at school and at home, [and] reports of nightmares." She could not discern the cause of E.J.'s nightmares. And McCandless

could not recall when E.J.'s nightmares began, but she stated that "what sticks out to me the most was like the last nine months."

{¶34} E.J.'s behaviors had improved over the course of his therapy. McCandless testified that when Mother's visitations stopped, "I noticed that the anxious behaviors seemed to decrease in severity as evidenced in his presentation coming to session and then reports given to me by Foster Mom."

{¶35} McCandless stated that E.J. likely would need continued therapy to address his anxiety and ADHD. And she testified that E.J. did not appear to remember the time he was with Mother.

{¶36} McCandless treated E.J. during a period when Mother was visiting with E.J. His sessions were immediately after Mother's visits. McCandless did not have "any major concerns" regarding E.J. during those sessions. She stated that E.J. is generally "very avoidant when talking about his experiences" with Mother, "the reported symptoms at home as well with the nightmare[,] and the reported behaviors after visits." E.J.'s therapist stated that E.J. refers to Foster Parents as "Mom" and "Dad."

#### d. Foster Mother testified that E.J. was part of their family

{¶37} Foster Mother testified that E.J. was bonded with her, her husband, and their family dog. Further, E.J. "is very integrated with our extended family" and refers to Foster Mother's and Father's parents as "Grandma" and "Grandpa," their siblings as "aunts" and "uncles," and their nieces and nephews as his cousins. Foster Mother testified that she and her husband want to adopt E.J.

{¶38} Foster Mother worked with E.J.'s school "to organize a 504 plan . . . for him." The 504 plan addresses E.J.'s "[i]mpulsive behaviors in the classroom and sensory needs and emotional regulation needs." E.J. had begun taking ADHD

medication in February 2025. Foster Mother believed that the medication helped improve some of E.J.'s behavior.

**{¶39}** Foster Mother testified that, after Mother's visitations ended in April 2024, E.J. "went through about two months where some of his behaviors increased, and then they started to decrease, specifically the defiance has significantly decreased." E.J. continued to have nightmares but not as frequently.

**{¶40}** Foster Mother believed it was in E.J.'s best interest to remain with her because E.J. had been in their home for almost five years and "this is the only home that he cognitively remembers. He is very integrated with our family and his local community. He is at a school that supports him. . . He has his needs met." She would be open to maintaining contact between E.J. and Mother if the juvenile court granted HCJFS permanent custody, as longs as "it is in [E.J.'s] best interest."

  e.  E.J.'s GAL testified about E.J.'s desires and best interest

**{¶41}** E.J.'s GAL, Julie Harrison, had been E.J.'s GAL since July 2023. Harrison visited Mother's home and stated that "we actually had quite a nice visit." She described Mother's home as "a rehab in progress. . . . She had it very well organized, things in place," but the home was not ready to be lived in "today if you went there right now." The room that would be E.J.'s had been "fully rehabbed . . . it would just be moving in the necessities."

**{¶42}** Harrison was "very, very proud of Mom for where she is today, but she's in the beginning of setting up her own sober life." Harrison had no evidence that Mother was not sober, but testified that "historically [Mother] has not faired very well in the community outside of treatment, but she's also never got this far." Harrison wanted to see Mother sober for a longer period before being comfortable recommending custody to Mother and, "unfortunately, we're five years in."

**{¶43}** E.J. discussed his wishes with Harrison and was "pretty adamant about his desire of wanting to stay with the foster parents . . . He is ready to stay there and be adopted."

### 3. *The juvenile court granted permanent custody to HCJFS*

**{¶44}** In July 2025, the juvenile court overruled Mother's objections to the magistrate's decision. It found that E.J. had been in temporary custody "for twelve or more months of a consecutive twenty-two-month period" at the time HCJFS filed its motion. Further, after considering the statutory factors, the juvenile court found that permanent custody was in E.J.'s best interest.

**{¶45}** The juvenile court awarded HCJFS permanent custody of E.J.

## II. Analysis

**{¶46}** In her sole assignment of error, Mother asserts that the juvenile court's finding that permanent custody was in E.J.'s best interest was not supported by sufficient evidence and was against the weight of the evidence.

### A. Standard of review

**{¶47}** In reviewing a juvenile court's decision terminating parental rights under R.C. 2151.414, this court applies a sufficiency-of-the-evidence and/or a manifest-weight-of-the-evidence standard of review, depending upon the nature of the arguments raised. *In re Z.C.*, 2023-Ohio-4703, ¶ 11. "Sufficiency of the evidence and manifest weight of the evidence are distinct concepts." *Id.* at ¶ 13.

**{¶48}** When reviewing a challenge to the sufficiency of the evidence, the court's role is to independently review the evidence to determine if the juvenile court's decision is supported by clear and convincing evidence. *In re S.D.*, 2020-Ohio-3379, ¶ 12 (1st Dist.). Clear and convincing evidence is evidence that "'will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be

established.'" *In re K.H.*, 2008-Ohio-4825, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. Sufficient evidence exists where the evidence in support of the juvenile court's permanent-custody findings satisfies this clear-and-convincing standard. *In re S.D.* at ¶ 12.

{¶49} When reviewing a challenge to the manifest weight of the evidence, we "weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the [juvenile] court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re A.B.*, 2015-Ohio-3247, ¶ 16 (1st Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12.

**B. Discussion**

{¶50} Before the juvenile court may grant HCJFS's motion for permanent custody of a child, it must find by clear and convincing evidence that (1) granting permanent custody to the agency is in the child's best interest, and (2) any one of the R.C. 2151.414(B)(1)(a)-(e) factors apply. *In re E.J.*, 2024-Ohio-2421, at ¶ 28 (1st Dist.), citing R.C. 2151.414(B)(1).

{¶51} Mother's challenge is limited to the juvenile court's best-interest determination.

**1. *Best-interest analysis***

{¶52} In considering the best interest of a child, the juvenile court must consider "all relevant factors," including,

(a) The interaction and interrelationship of the child with the child's

parents, siblings, relatives, foster caregivers and out-of-home providers,

and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through

13

the child's guardian ad litem, with due regard for the maturity of the

child;

(c) The custodial history of the child . . . ;

(d) The child's need for a legally secure permanent placement and

whether that type of placement can be achieved without a grant of

permanent custody to the agency;

(e) Whether any of the factors in [R.C. 2151.414](E)(7) to (11) . . . apply

in relation to the parents and child.

R.C. 2151.414(D)(1)(a)-(e).

**{¶53}** Courts should not give more weight to any single factor over another

factor. *In re S.H. and Y.H.*, 2025-Ohio-2338, ¶ 53 (1st Dist.).

a. Child's relationships

**{¶54}** R.C. 2151.414(D)(1)(a) directs a court to consider the child's

relationships with others.

**{¶55}** Mother asserts that this factor weighed in her favor and against granting

HCJFS permanent custody because her visits with E.J. went well, E.J. was "always

excited to see" her, and she is bonded with E.J. Mother additionally asserts that even

though she "has a three to four hour drive to and from the visits from her treatment

center, she has not missed a visit."

**{¶56}** It is clear that Mother loves and cares about E.J., and that the two share

a bond. But significant periods of time elapsed over the course of the case in which

Mother had no contact with E.J. The testimony at the hearings established that these

extended absences caused E.J. anxiety and led to an increase in his disruptive

behaviors.

**{¶57}** Further, E.J.'s psychological evaluation conducted in late 2024

determined that E.J. exhibited symptoms related to Mother's neglecting him when he was in her care. For example, E.J. experienced emotional distress as a result of his trauma, such as nightmares, trauma-related negative feelings and thoughts, irritability after visits with Mother, and "hypervigilance towards potentially trauma-related stimuli." The psychological report determined that E.J.'s symptoms were consistent with posttraumatic stress disorder and that Mother's past neglect of E.J., coupled with her inconsistent visitation, caused E.J.'s ongoing emotional issues.

**{¶58}** Moreover, E.J. is indisputably bonded with his foster family. The juvenile court removed E.J. from Mother's custody when he was 18 months old and he has been placed with his foster family for more than five years. E.J. refers to his foster parents as "Mom" and "Dad," and uses similar familiar terms for his extended foster family. And E.J.'s foster family has connected E.J. with appropriate providers to address his physical, behavioral, and emotional needs.

**{¶59}** Mother acknowledged that E.J.'s foster family deserved significant recognition for the care they had provided him. Mother testified that she wanted E.J. to live with his foster family, while continuing to be part of each other's lives. Though Mother later clarified that she wanted permanent custody of E.J., her testimony shows that she believed that E.J.'s placement with the foster family was in his best interest.

**{¶60}** The juvenile court correctly determined that this factor weighed in favor of granting HCJFS's permanent-custody motion.

b. E.J.'s wishes

**{¶61}** Next, courts consider the "wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b). The juvenile court's decision stated that at the "time of the trial in 2023, E.J. was too young to express his wishes" and noted that Harrison

15

supported permanent custody to HCJFS.

{¶62} Initially, Mother argues that Harrison's recommendation, "although referenced by the trial court, is irrelevant to determining the child's wishes." But the plain language of the statute requires the juvenile court to consider a GAL's recommendation. Further, Harrison testified that in conversations with E.J. before her April 2025 testimony, he told her that he wanted to stay with his foster family and be adopted by them.

{¶63} This factor weighed in favor of permanent custody.

c. Custodial history

{¶64} R.C. 2151.414(D)(1)(c) requires courts to consider the child's custodial history. As the juvenile court found, HCJFS received interim custody of E.J. in April 2020 and E.J. was placed in temporary custody in August 2020. He has remained with the same foster family for five years.

{¶65} Mother acknowledges this case history but asserts that the time children spend in temporary custody "does not weigh against the parents when they are using the time, as mother here, to complete case plan goals." While Mother engaged in treatment programs addressing her mental health and drug addiction during the pendency of the case, the case was pending for five years. Mother's progress in her sobriety journey is commendable. But in the end, a child's best interest is the paramount consideration, rather than a parent's efforts. This factor weighs in favor of granting HCJFS permanent custody.

d. Legally secure placement

{¶66} R.C. 2151.414(D)(1)(d) looks at a "child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." A legally secure permanent placement

means ""more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs."" *In re S.H. and Y.H.*, 2025-Ohio-2338, at ¶ 63 (1st Dist.), quoting *In re P. & H.*, 2019-Ohio-3637, ¶ 42 (1st Dist.), quoting *In re K.W.*, 2018-Ohio-1933, ¶ 87 (4th Dist.).

**{¶67}** The juvenile court found that Mother could not provide a legally secure placement based on mother's history of drug addiction and mental illness, and the effects Mother's past neglect had on E.J.'s mental health.

### Mother addressed her drug addiction

**{¶68}** The juvenile court stated that "Mother has excelled in her journey to sobriety," and further noted that Mother had consistently tested negative for drugs and continued to attend group sessions at Cardinal despite having completed the program. But the juvenile court observed that Mother's sober support system "are all recovering addicts" and that Mother conceded that "relapse is a common occurrence in the recovery community."

**{¶69}** Other than a generalized acknowledgment that those suffering from drug addiction may relapse, the juvenile court cited no evidence that *Mother* was likely to relapse. While Mother had attended other drug-treatment programs and relapsed, the evidence shows that Mother had been sober for an extended period of time and continued to engage in sobriety efforts. Indeed, faced with the presumably considerable stress of the juvenile court's previous termination of her parental rights, Mother maintained her sobriety and continued to better herself. While relapse is always possible, there was no evidence in the record that Mother is likely to relapse.

Mental-health concerns

{¶70} Next, the juvenile court stated that it was "unclear" whether Mother had "fully engaged in mental health services," noting that after the juvenile court's initial permanent-custody determination in 2024, Mother had stopped attending therapy and taking mental-health medication.

{¶71} Mother's medical records indicate that she has been diagnosed with PTSD and generalized anxiety disorder. She had two hospital admissions in late 2021 and early 2022 related to her experiencing psychotic symptoms. But since Mother's admission to Cardinal in August 2022, there is no evidence that these psychotic symptoms persisted. Mother's testimony on remand was that her mental health was the "[b]est its ever been." She regularly attends group sessions in the recovery community. Moreover, Mother returned to her mental-health treatment provider after this court's remand. She engages in monthly individual therapy sessions, but no longer takes medication.

{¶72} Neither HCJFS nor Harrison presented evidence that Mother would not be able to manage her PTSD and anxiety without medication. There is no clear and convincing evidence that Mother's choice to manage her anxiety through behavioral and lifestyle changes, rather than with medication, is sufficient to justify a finding that she cannot provide E.J. a legally secure permanent placement. Without evidence to the contrary, the only things to which HCJFS and Harrison can point are generalized "concern" and speculation about what Mother may do, which is not clear and convincing evidence.

E.J.'s needs

{¶73} The juvenile court observed that E.J.'s psychological report connected E.J.'s anxiety and PTSD to Mother's behavior when E.J. was younger. Further, Mother

18

did not participate in E.J.'s mental-health and school-based services.

{¶74} Mother testified that she supported E.J.'s participation in therapy and if she obtained custody of him, E.J. would attend therapy at Mahajan. But Mother was unaware of recent developments in E.J.'s mental health and educational needs, including his ADHD diagnosis and 504 plan at school.

<u>Mother had obtained stable housing</u>

{¶75} Mother had been renting a home since August 2024 and had completed substantial renovations to the home. Harrison testified that the house was organized, though E.J.'s room needed to be furnished.

{¶76} Ultimately, the juvenile court's finding that Mother could not provide a legally secure placement likely was not supported by the record. Mother was three years sober, managed her mental health through lifestyle and behavioral changes, and lived in a home currently under renovation. These factors alone do not lead to a finding that a parent cannot provide a child a secure placement. And E.J.'s mental-health concerns caused by Mother's previous behavior are appropriately weighed under R.C. 2151.414(D)(1)(a)'s focus on E.J.'s relationships.

{¶77} But we need not definitively resolve this issue because even if we held that this factor weighed in Mother's favor, the other best-interest factors support the juvenile court's decision granting permanent custody to HCJFS.

e. <u>Any other factor</u>

{¶78} Finally, R.C. 2151.414(D)(1)(e) considers if "any of the factors in [R.C. 2151.414](E)(7) to (11) . . . apply in relation to the parents and child." Mother challenges the juvenile court's determination that R.C. 2151.414(E)(10) applied due to Mother's abandoning E.J. The juvenile court stated that Mother went "multiple periods of not visiting with E.J. for over 90 days."

**{¶79}** R.C. 2151.011(C) carries a rebuttable presumption that a parent abandons a child when the parent does not visit or contact a child for more than 90 days, even if the parent resumes contact after this timeframe. *In re S.H. and Y.H.*, 2025-Ohio-2338, at ¶ 68 (1st Dist.); *see In re L.L.*, 2020-Ohio-1565, ¶ 16 (3d Dist.) ("Numerous courts, including this one, have determined that R.C. 2151.011(C) creates a presumption of abandonment, which may be rebutted by the parents."); *see also In re Custody of C.E.*, 2005-Ohio-5913, ¶ 17 (2d Dist.) ("Because the presumption set forth in R.C. 2151.011(C) is in derogation of the natural rights of parents, we construe it narrowly as a rebuttable presumption, rather than expansively, as an irrebuttable presumption.").

**{¶80}** Ohio courts have offered varying explanations about what is required to rebut the abandonment presumption. For example, the Second District held that "abandonment, as used in Chapter 2151, requires proof of intent to relinquish parental rights of custody permanently, not just temporarily." *In re Custody of C.E.* at ¶ 2. But the Tenth District disagreed with this approach: "'R.C. 2151.011(C) does not contain a requirement of any particular "intent" on behalf of the parent; rather, the provision defines "abandonment" solely in terms of the time between contacts.'" *In re B.B.H.*, 2015-Ohio-2347, ¶ 34 (10th Dist.), quoting *In re D.P.,* 2007-Ohio-1703, ¶ 26 (10th Dist.). Notably, however, the Tenth District recently held that a father successfully rebutted the abandonment presumption where "he took steps to resume visits but was precluded from seeing [the child] due to reasons that were not his fault." *In re A.M.*, 2025-Ohio-4435, ¶ 62 (10th Dist.).

**{¶81}** The Tenth District's holding in *In re B.B.H.* is incompatible with a long line of cases—including cases from this court—holding that the presumption of abandonment is rebuttable. If the reason for a parent's lack of contact with a child is

irrelevant to rebutting the presumption of abandonment, and a court must mechanically focus on the length of the lack of contact, then there is nothing relevant to the child's best interest that could rebut the presumption. Because a parent can rebut the presumption of abandonment, the focus must be on the reason for the lack of contact between the child and parent during the period of abandonment itself. *Compare In re Custody of C.E.*, 2005-Ohio-5913, at ¶ 15 (2d Dist.) (holding that Mother rebutted the presumption of abandonment where she avoided contact with her children for the purpose of avoiding an abusive partner), *with In re C/S Children*, 2025-Ohio-1639, ¶ 40 (1st Dist.) (presumption of abandonment was not rebutted where "[n]either Mother nor F.C.S. introduced evidence to justify their absence.").

<u>May 2022 through February 2023</u>

**{¶82}** The juvenile court's decision noted that Mother went from May 2022 to February 2023 without visiting or having contact with E.J.

**{¶83}** Mother had unsupervised visitation with E.J. in 2021. After Mother's two psychiatric hospital admissions, her visits changed to being supervised, and the visits were ultimately terminated when Mother entered inpatient treatment at Woodhaven in May 2022. Mother was discharged from Woodhaven in July 2022. She then entered inpatient treatment at Cardinal in August 2022. Mother testified that she intentionally avoided contact with E.J. during this period because she believed that due to her unstable mental health, it was in E.J.'s best interest for her to not have contact with him. In October 2022, Mother requested to resume visitations, but HCJFS opposed her request because it reported that E.J.'s therapist believed visitation was not in E.J.'s best interest. In December 2022, the juvenile court ruled that Mother could resume visitation if Mother's therapist and E.J.'s therapist met and determined Mother and E.J. were "psychologically ready" to resume visitation. In January 2023,

the juvenile court reported that the therapists had agreed that visitation would be appropriate and the juvenile court ordered HCJFS to resume visits.

{¶84} HCJFS and Harrison assert that the entire May-2022-to-February-2023 period should be held against Mother. But because Mother filed a formal request for visitation in October 2022 and visitation was delayed only because of HCJFS's opposition, that entire period will not be held against Mother. *See In re Cravens*, 2004-Ohio-2356, ¶ 22 (3d Dist.) ("if [Father] attempted to visit [child], but was prevented from doing so by Family Services, it would be difficult to conclude that his actions were the equivalent of abandonment."); *see also In re Adoptions of Groh*, 2003-Ohio-3087, ¶ 49 (7th Dist.) ("Appellant was justified in not visiting the children in the year before the adoption petitions were filed, [] because Appellees deliberately made it difficult for Appellant to contact them or find where they were living."); *compare In re L.D.*, 2004-Ohio-4000, ¶ 21 (12th Dist.) (parents abandoned their child where they did not visit or contact child for 15 months despite parents having "stopped by the agency once" and called a handful of times "but did not inquire or arrange any visits"); *In re Katrina T.*, 2004-Ohio-3164, ¶ 16 (6th Dist.) ("While . . . appellant would call the caseworker and leave a message that she wanted to visit her daughters . . . she would not leave a telephone number where she could be reached, and she did not appear for scheduled visitations.").

{¶85} But because May 2022 through October 2022 is greater than 90 days, the rebuttable presumption of abandonment applies.

{¶86} Mother asserts that she rebutted the presumption because "the lack of visitation for a period was due to her residential treatment stays and the issues with mental health." Under the circumstances of this case, we find that Mother did not rebut the presumption. The case plan required Mother to address her mental-health

and substance-abuse issues while remaining in contact with E.J. At least one court has found that a parent cannot stop pursuing one case-plan objective to address another objective. *In re D.P.*, 2007-Ohio-1703, ¶ 8 (10th Dist.) ("[T]he goals in the case plan neither suggest the pursuance of the case plan objectives at the cost of contact with child nor promote such a result.").

**{¶87}** We hold that the juvenile court did not err in finding that Mother abandoned E.J. from May 2022 through October 2022.

### 2. *The best-interest factors supported permanent custody*

**{¶88}** Our observation in *In re E.J.*, 2024-Ohio-2421, at ¶ 35 (1st Dist.)—"this case is not as clear cut as many other parental-termination cases"—remains true. But we hold that clear and convincing evidence supports the juvenile court's determination that awarding HCJFS permanent custody of E.J. is in his best interest. E.J. is bonded with his foster family, with whom he spent more than five years of his life beginning when he was 18 months old. E.J. wishes to be adopted by his foster family and his foster parents want to adopt him. Mother's previous neglect of E.J. caused him lasting psychological harm. And Mother's inconsistent presence in his life has caused E.J. anxiety and stress.

**{¶89}** The evidence establishes that Mother has "excelled in her journey to sobriety," and her efforts to better herself and help others on their journeys to sobriety are admirable. It is abundantly clear that Mother loves E.J. But although Mother may be able to provide a legally secure placement for E.J., the Supreme Court of Ohio has made clear that R.C. 2151.414 "does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *In re Schaefer*, 2006-Ohio-5513, ¶ 64. We hold that the juvenile court's decision

granting HCJFS permanent custody of E.J. was supported by sufficient evidence and not against the manifest weight of the evidence.

### III. Conclusion

**{¶90}** We overrule Mother's assignment of error and affirm the juvenile court's judgment.

Judgment affirmed.

**ZAYAS, P.J.,** and **NESTOR, J.,** concur.